LAW OFFICES OF THOMAS D. MAURIELLO
THOMAS D. MAURIELLO  (SBN 144811)
209 Avenida Fabricante, Suite 125
San Clemente, CA 92672
Telephone: (949) 542-3555
Facsimile: (949) 606-9690
tomm@maurlaw.com

(Additional counsel appear on signature page)
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BRIAN J. WOLIN, On Behalf of Himself and All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        vs.<br><br>LAND ROVER NORTH AMERICA, INC.,<br><br>                    Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **CASE NO. 8:07-cv-0627-AG-RNB**<br><br>**PLAINTIFF'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |

1    Plaintiff, Brian J. Wolin ("Plaintiff" or "Wolin"), respectfully submits his

2    Proposed Findings of Fact and Conclusions of Law in Support of Motion for Class

3    Certification pursuant to this Court's June 23, 2008 request following oral

4    argument.[1]

5    _____

6    [1]Plaintiff relies on a number of pleadings, declarations, exhibits and

7    depositions that have been made part of the underlying record in this case as

     follows: (1) Complaint [docket entry 1] ("Complaint"); (2) Memorandum of Points

8    and Authorities in Support of Motion for Class Certification [docket entry 20]

9    ("Cert. Memorandum"); (3) Declaration of Karen M. Leser Grenon in Support of

     Motion for Class Certification [docket entry 21] and accompanying Exhibits 1- 30

10   ("Grenon Decl."); (4) Declaration of Robert J. Wozniak [docket entry 17] and

11   accompanying Exhibits A-R ("Wozniak Decl."); (5) Opposition to Motion for

     Class Certification [docket entry 39] ("Cert. Opposition"); (6) Declaration of

12   George Sherrey [docket entry 39] and accompanying Exhibits A-B ("Sherrey

13   Decl."); (7) Declaration of John Daws [docket entry 39] and accompanying

14   Exhibits A-I ("Daws Decl."); (8) Declaration of Kevin S. Willen [docket entry 39]

     and accompanying Exhibits 1-40 ("Willen Decl."); (9) Reply Memorandum of

15   Points and Authorities in Support of Motion for Class Certification [docket entry

16   51] ("Cert. Reply Memorandum"); (10) Declaration of Thomas D. Mauriello in

     Support of Motion for Class Certification [docket entry 52] and accompanying

17   Exhibits 1-6 ("Mauriello Decl."); (11) Rebuttal Declaration of Robert J. Wozniak

18   [docket entry 46] and accompanying Exhibits 1-4 ("Wozniak Rebuttal Decl.");

19   (12) *Ex Parte* Application for Leave to File Response to Plaintiff's Reply in

     Support of Motion for Class Certification [docket entry 54] ("*Ex Parte* App.");

20   (13) Defendant's Response to Plaintiff's Reply [docket entry 54] ("Response

21   Memorandum"); (14) Declaration of Martin A. Price [docket entry 54] and

     accompanying Exhibit ("Price Decl."); (15) Supplemental Declaration of John W.

22   Daws [docket entry 54] ("Daws Supp. Decl."); (16) Memorandum of Points and

23   Authorities in Opposition to Defendant's *Ex Parte* Application to File Sur-Reply

     [docket entry 55] ("*Ex Parte* Opposition"); (17) Declaration of Mark Anderson

24   [docket entry 56] ("Anderson Decl."); (18) Reply in Support of Motion to Certify

25   Class [docket entry 58] ("Reply Memorandum"); (19) Declaration of James C.

     Shah [docket entry 59] ("Shah Decl."); (20) Declaration of Robert J. Wozniak

26   [docket entry 60] and accompanying Exhibits 1-3 ("Wozniak Reply Decl."); (21)

27   Notice of Supplemental Authority [docket entry 62] ("Supplemental Authority");

28   and (22) Response to Notice of Supplemental Authority [docket entry 63]

# [PROPOSED] FINDINGS OF FACT

## I.   BACKGROUND FACTS

1.     This is a class action arising as a result of an alleged defect in the alignment geometry in model year 2005 and 2006 Land Rover LR3 vehicles ("Vehicles" or "LR3s").  (Complaint at ¶ 1.)[2]  As discussed below, Land Rover has acknowledged the existence of this defect in its own internal documents.

2.     As a result of the defect, Plaintiff alleges that the Vehicles are, or become, misaligned, thereby resulting in the premature and uneven wear of the Vehicles' tires (often requiring tire replacement at less than 15,000 miles of use).  (Complaint at ¶ 11.)

3.     Defendant, Land Rover North America, Inc. ("Land Rover" or

---

("Supplemental Authority Response").  Plaintiff further relies on the deposition testimony of Alan Clarke, Donald Krumholz, Stephanie Lutz, Leo McAdams and Kevin McGurl, relevant portions of which are attached, respectively, as Exhibits 25-29 to the Grenon Decl., and the deposition testimony of John W. Daws, George Sherrey, Michael Snyder and Terry Barker, relevant portions of which are attached, respectively, as Exhibits 3-6 to the Mauriello Decl.  All references to deposition testimony include the first initial of the deponents first name and full last name and are cited as follows "A. Clark Dep at __."  Plaintiff also relies on the Declaration of Thomas Kennedy (Kennedy Decl.), which is attached as Exhibit 30 to the Grenon Decl.

[2]Although it would not typically be appropriate to rely upon a complaint or other pleading in issuing post-trial findings of fact or conclusions of law, in the class certification context, it is appropriate for the Court to rely upon certain averments of the parties, since the question of whether common questions or fact and law predominate in this class action is at the heart of the Court's determination at the class certification stage. *See Chamberlin v. Ford Motor Company*, 402 F.3d 952 (9th Cir. 2005)(affirming certification of class based upon averments in complaint).

"Defendant"),[3] became aware of the defect shortly after the model year 2005 LR3s were brought to market and it has received, and continues to receive, voluminous complaints from Vehicle owners and lessees. (A. Clarke Dep. at 19:19-21; Grenon Decl. at Exs. 8-9; L. McAdams Dep. at 40:1-3; 77:11-19.)

4.     Despite its knowledge of the defect, as detailed below, Land Rover has continued to sell and lease the Vehicles without disclosing the existence of the defect to owners, lessees, or the consuming public. (Complaint at ¶ 16.) Although the tire wear, which is attributable to the Vehicle defect, was clearly covered by Land Rover's uniform warranty (and Defendant's senior management acknowledged this fact internally), Land Rover has refused to provide complete warranty coverage because it is more concerned with controlling costs than with honoring its obligations. (Grenon Decl. at Ex. 14.)

5.     Wolin initiated this class action against Land Rover for the benefit and protection of all current and former owners and lessees of Vehicles purchased or leased in the State of Florida and seeks certification of the following proposed class ("Class"):

**Class**:

> All current and former owners and lessees of model year 2005 and 2006 Land Rover LR3s purchased or leased in the State of Florida.

(Complaint at ¶ 20.)

6.     From the record before the Court, as pled in the Complaint, it appears

-----

[3]The Court notes that, on July 14, 2008, Defendant filed an Amended Certificate of Interested Parties to reflect the sale of Land Rover by Ford Motor Company ("Ford") to Tata Motors Limited ("Tata") and, in that pleading, requested that the caption be changed to reflect Defendant's new corporate name, Jaguar Land Rover North America, LLC ("JLRNA"). All references in these Findings of Fact and Conclusions of Law to Land Rover shall be deemed to be made with respect to JLRNA as well, in recognition of JLRNA's admitted status as the corporate successor to Land Rover.

1   that the defect at issue is common and uniform and has had a negative and

2   profound impact on the wear of the tires on Plaintiff's Vehicle, thereby

3   necessitating their premature replacement. (Complaint at ¶¶ 15-16.) As discussed

4   below, in recognition of the fact that all of the Vehicles at issue are equally

5   susceptible to suffering premature or uneven tire wear as a result of an

6   acknowledged defect, Land Rover has treated all of the Vehicles at issue in this

7   litigation in the same manner.

8        7.    As discussed below, the testimony and business records of Land

9   Rover, as well as third parties, confirm the widespread existence of this common

10  defect in the Vehicles and the suitability of this case for class action treatment.

11       **A.    <u>Land Rover's Sale And Distribution Of The Vehicles</u>**

12       8.    Land Rover, through its authorized dealers, marketed and sold the

13  Vehicles throughout the United States, including Florida. (Complaint at ¶¶ 1, 5.)

14  All of the Vehicles were factory equipped with Goodyear Wrangler tires. (K.

15  McGurl Dep. at 77:24-25; 78:1-4; Complaint at ¶ 5.)

16       9.    Land Rover provided Plaintiff and all Class members with a 4 year,

17  50,000 mile bumper-to-bumper factory warranty. (Complaint at ¶ 17.) The

18  warranty was the same for all of the Vehicles. (D. Krumholz Dep. at 113:20-24;

19  A. Clarke Dep. at 149:6-12.)

20       10.   Under the terms of Land Rover's express warranty, where, as here,

21  tire wear is caused by a defect in the Vehicles, Land Rover is obligated to replace

22  all of the tires and pay for any required alignment. (Complaint at ¶ 17.) Land

23  Rover also is obligated to repair the defect that causes the premature and uneven

24  wear. (Complaint at ¶ 17; Grenon Decl. at Ex. 14.)

25       11.   Nevertheless, it appears that Land Rover knowingly violated its own

26  warranty policy in an effort to contain costs by shifting expenses associated with

27  its warranty obligation to its customers -- that is, the Class.

28

**B.**     **The Vehicle Defect**

12.    The particular defect at issue, as Land Rover acknowledges, pertains to the alignment geometry of the Vehicles.  (Complaint at ¶ 10; Wozniak Decl. at ¶¶ 3, 14.)  As a result of the defect, the tires are, or become, misaligned and wear unevenly and prematurely, causing the occupants to experience an extremely rough ride, as well as exceptionally loud and disruptive noise, while driving the Vehicles.  (Wozniak Decl. at ¶¶ 11-12.)  As a result of the wear, the tires must frequently be replaced prematurely, in many cases after less than 15,000 miles.  (Wozniak Decl. at ¶ 11.)

13.    Land Rover's internal documents reflect that owners and lessees were reporting uneven and premature tire wear after as little as approximately 4,000 miles.  (Grenon Decl. at Ex. 1.)

14.    In recognition of the defect, and the resulting premature and uneven tire wear, in the Fall of 2006, Land Rover issued Technical Service Bulletin LA204-005 ("TSB"), which stated as follows:

> A customer may report a concern of uneven tire wear.  The steering alignment geometry of certain vehicles may experience some bushing settlement during early vehicle life.  Following initial production geometry setting, this may alter the geometry settings outside of normal tolerance, which may in turn increase tire wear.

(Grenon Decl. at Ex. 2.)

15.    In addition to acknowledging that the Vehicle defect caused the uneven and premature tire wear, the TSB provided dealers with guidelines for readjusting the geometry settings to purportedly address the effects of the defect.  (Grenon Decl. at Ex. 2; Wozniak Decl. at ¶ 3.)

16.    The TSB was applicable to all of the Vehicles on a uniform basis.  (Grenon Decl. at Ex. 2; Wozniak Decl. at ¶ 3.)

17.    The fact that the Vehicle defect (as opposed to individual driving habits) was causing the uneven and premature tire wear was accepted throughout

1  Land Rover.  As Alan Clarke ("Mr. Clarke"), Land Rover's Product Investigation

2  Manager, noted in a March 19, 2006 email, "[w]e have a known factory defect

3  causing misalignment and premature tire wear."  (Grenon Decl. at Ex. 3; A. Clarke

4  Dep. at 140:16-23; 141:1-10; D. Krumholz Dep. at 31:1-15; 32:1-6.)

5           **C.    Land Rover's Knowledge And Conduct Regarding The Defect**

6           18.    Both the existence of the defect and Land Rover's attendant

7  obligation under its warranty were known to Land Rover very early during the

8  selling cycle of the Vehicles, and well before a majority of the Vehicles were

9  marketed and sold.  [*See* Sherrey Decl. at ¶ 17 (averring that the Vehicles were

10 released into production in the Summer of 2004.)]  With respect to the Vehicles,

11 Mr. Clarke acknowledged that he "first became aware of any customer concern

12 with LR3 tire wear [in] approximately the middle of 2005."  (A. Clarke Dep. at

13 19:19-21.)

14         19.    Indeed, as Kevin McGurl ("Mr. McGurl"), a Product Analyst,

15 candidly acknowledged in correspondence to an engineer based in the UK on May

16 5, 2006, "the 'whole world [meaning the Land Rover dealer world]'" knew that

17 the Vehicles had "big issues with the rear tires."  (Grenon Decl. at Ex. 4.)  Mr.

18 McGurl further acknowledged that the defect and Land Rover's strategy regarding

19 the same was of paramount importance when, in the course of seeking answers

20 regarding the defect from the same UK-based engineer, he stated:  "Simplist [sic]

21 of simple questions....because some big shots are asking..... and that's how they

22 ask, in bottom line terms...... so give me the simplist [sic] of answers.... so that I

23 may retain my job."  (Grenon Decl. at Ex. 6.)

24         20.    In April 2006, Stephanie Lutz ("Ms. Lutz"), Land Rover's Warranty

25 Manager, sent an email inquiry about the status of the "LR3 tire wear and ...

26 alignment issue" and indicated that it would be a "hot issue [at the upcoming parts

27 and service managers meeting] in Nashville."  (Grenon Decl. at Ex. 5; S. Lutz

28

1 │ Dep. at 63:4-16.)

2 │     21.    Although Land Rover was aware of the widespread nature of the

3 │ defect in the alignment geometry, and the fact that it was the cause of premature

4 │ and uneven tire wear in the Vehicles, Land Rover took no steps to notify its

5 │ customers of the defect or to provide relief of any kind until October 2006 -- as

6 │ noted above, approximately two (2) years after the Vehicles began being sold.  At

7 │ that late date, after most of the Vehicles had already been sold or leased, Land

8 │ Rover finally began to cover certain costs associated with temporary correction of

9 │ the alignment on the Vehicles and, on a *pro rata* basis, began providing certain

10 │ limited (albeit facially inadequate) reimbursements for prematurely worn tires as

11 │ follows:

12 │        •    Less than 5,000 miles    -    100%

13 │        •    5,000 to 7,5000 miles    -    80%

14 │        •    7,500 to 10,000 miles    -    70%

15 │        •    10,000 to 15,000 miles    -    50%

16 │ (Grenon Decl. at Ex. 11; D. Krumholz Dep. at 58:5-16.)

17 │     22.    The breadth of the problem eventually resulted in at least a "five-

18 │ fold" increase in demand for replacement tires for the Vehicles.  (Grenon Decl. at

19 │ Ex. 7.)  As Donald Krumholz ("Mr. Krumholz"), Land Rover's Sales Operation

20 │ Manager, confirmed, at least  "70-80%" of that increased demand was the result of

21 │ premature wear caused by the defect. [Grenon Decl. at Ex. 8; *see also* Grenon

22 │ Decl. at Ex. 9 ("Dealer and field staff feedback suggest that 75% of these tires are

23 │ being replaced due to premature/uneven wear.").]  Furthermore, this dramatic

24 │ increase in tire demand was significantly understated because, *inter alia*, it did not

25 │ account for (1) tires purchased outside of the Land Rover tire program; (2)

26 │ replacement utilizing non-Goodyear Wrangler tires; and (3) tires replaced by third-

27 │ party tire shops, all of which were occurring on a regular basis.  (D. Krumholz

28 │

CASE NO. 8:07-cv-0627-AG-RNB      **PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**    Page -7-

1   Dep. at 98:14-23; 109:3-7, 16-25; 110:1-5; 113:6-11; Grenon Decl. at Ex. 10; K.

2   McGurl Dep. at 78: 5-13; A. Clarke Dep. at 124:17-25; 125:1-8.)  This evidence

3   belies any assertion by Land Rover that the defect at issue was a small problem or

4   only manifested itself in a low number of Vehicles.  As discussed below, Land

5   Rover's own documents specifically reflect the fact that its "warranty data," upon

6   which Land Rover attempts to place great reliance, is unreliable with respect to the

7   number of Vehicles that experienced premature or uneven tire wear as a result of

8   the defect at issue.

9        23.    The tire wear issue was so prevalent that Land Rover sent Mr.

10   McGurl and John Turnbull (a UK Wheels and Tire Group Leader) to visit nine

11   different dealerships in December 2006 to specifically discuss the Vehicle tire

12   wear issue. (Grenon Decl. at Ex. 12.)  Among the conclusions reached during the

13   visits were (1) "[c]urrent tire life with Good Year is far below customer

14   expectations;" (2) "[t]he Land Rover Tire Wear Goodwill Policy is not creating a

15   feeling of goodwill with many customers;" and (3) "[t]he tire wear issue has

16   caused irreparable damage to the brand in terms of repeat sales."  (Grenon Decl. at

17   Ex. 12.)

18        24.    The defect caused significant and widespread premature tire wear on

19   the Vehicles.  Michael Snyder ("Mr. Snyder"), the Service Manager for Land

20   Rover Palm Beach (Florida), indicated that prior to seeing premature tire wear on

21   the Vehicles, he had not documented any complaints from customers about

22   premature tire wear on any Land Rover vehicle.  (M. Snyder Dep. at 20.)  Mr.

23   Snyder also indicated that he was unaware of any other technical service bulletins

24   being issued that related to premature tire wear on any Land Rover cars other than

25   the Vehicles at issue in this litigation.  (M. Snyder Dep. at 23.)  With respect to the

26   Vehicles, Mr. Snyder articulated his understanding (as confirmed by Land Rover)

27   that the tire wear was caused by a Vehicle defect "because it was unusual for [Mr.

28

1  Snyder] to see tire wear at that low mileage on an abnormal number of cars." (M.

2  Snyder Dep. at 43.)  In recognition of the fact that consumers reasonably expect, at

3  an absolute minimum, to receive at least 30,000 miles from a set of tires, Mr.

4  Snyder began providing goodwill relief to customers based upon an expected

5  30,000 mile useful assumption, prior to Land Rover's implementation of its

6  service bulletin -- which only was based upon a 20,000 mile useful life

7  assumption.  (M. Snyder Dep. at 48.)  Moreover, Mr. Snyder acknowledged that

8  he had observed hundreds of tires in connection with submitting claims under the

9  TSB, which is significant given that the Florida dealership sold and/or leased

10  approximately 230 Vehicles.  (M. Snyder Dep. at 43, 74.)

11      25.    The significant scope of the issue was confirmed by Terry Barker

12  ("Mr. Barker"), the Service Manager for Land Rover Nashville, who stated that his

13  dealership had submitted, at a minimum, 50 to 100 claims under the TSB, and

14  possibly more.  (T. Barker Dep. at 59-62.)

15      26.    In light of this testimony and evidence, Defendant's attempt to

16  categorize the defect at issue as inconsequential is unpersuasive.  First, the data

17  cited by George Sherrey ("Mr. Sherrey"), Land Rover's Group Leader for Chassis

18  Systems Integration, with respect to warranty code H62 (the warranty code that

19  Mr. Sherrey identifies as applicable to improper tire wear) was collected in

20  January, 2006, *see* Sherrey Decl. at ¶ 18, and Mr. Sherrey never directly addresses

21  the number of claims regarding premature or uneven tire wear and, instead, states

22  simply that "[t]here were very few claims for tyre noise" without addressing the

23  number of claims for tire wear.  (Sherrey Decl. at ¶ 18.)  Second, although Mr.

24  Sherrey states in his Declaration that "there appeared to be little relationship

25  between tyre noise and tyre wear," he does not explain how a warranty database

26  would capture such information, what investigation was conducted to reach this

27  conclusion or why it would be necessary to conclude that there necessarily would

28

1   need to be a nexus between observed (or heard) tire noise and manifested (or

2   apparent) premature or uneven tire wear to accept Plaintiff's theory of this case.

3   Third, the majority of Mr. Sherrey's Declaration is devoted to steps that Land

4   Rover took to address the acknowledged defect, *see* Sherrey Decl. at ¶¶ 18-38,

5   which would appear to support Plaintiff's position that a serious defect plagued

6   the Vehicles at issue.  Fourth, in paragraph 39 of Mr. Sherrey's Declaration, he

7   asserts that "there has not been a significant amount of warranty data for repeat

8   tyre wear claims," but Mr. Sherrey never explains in his Declaration (a) the actual

9   number of initial (as opposed to repeat) tire wear claims that were submitted to

10  Land Rover (which has obvious importance given the allegations of this case), or

11  (b) why, given the limitation on claims covered by Land Rover's service bulletins

12  (discussed below)(*i.e.*, that reimbursement would only occur for the first 20,000

13  miles of use of the Vehicles), a statement with respect to warranty data for repeat

14  tire wear claims would be meaningful or helpful in the context of this case -- since,

15  in light of that limitation of coverage in terms of Vehicle mileage, one logically

16  would expect most "repeat" claims to occur after a given Vehicle had been utilized

17  for 20,000 miles, and it is undisputed that Land Rover did not cover the tire wear

18  occurring as a result of the defect under its normal warranty, which is 50,000 miles

19  in length.  Land Rover's own documents appear to conclusively establish that Mr.

20  Sherrey's reference to warranty data is neither meaningful nor reflective of the

21  actual experience of customers who own or lease these Vehicles.  Specifically, in a

22  document dated January 30, 2007, for which Mr. Sherrey is listed as an Editor,

23  under the heading, "Analysis of Problem," the following admission appears:

24  "***Warranty data does not reflect the order of magnitude reported by the dealer***

25  ***network....***" (Mauriello Decl. at Ex. 2 - LRUK 00144194.)

26      27.   A *pro rata* reimbursement was first provided to dealerships in the

27  form of a service bulletin dated October 2, 2006 ("SB1").  (D. Krumholz Dep. at

28

1   60:5-7.)  SB1 (and all subsequent service bulletins) applied to all Vehicles.  (D.

2   Krumholz Dep. at 60:8-19; 62:2-9.)

3         28.    In addition to setting forth *pro rata* reimbursement tables, SB1

4   articulated a uniform alignment procedure, applicable to all Vehicles, in an effort

5   to ameliorate the effect of the defect.  (D. Krumholz Dep. at 60:8-19; 62:2-9.)

6   SB1 was not retroactive and notice was never provided to Vehicle owners and

7   lessees regarding the benefit (albeit inadequate) available under SB1 (or any

8   subsequent service bulletins).  (D. Krumholz Dep. at 81:1-25.)

9         29.    On or about October 23, 2006, Land Rover modified the schedule to

10  provide for a 50% reimbursement on tires between 10,000 and 18,750 miles of use

11  on the Vehicles.  (Grenon Decl. at Ex. 13.)

12        30.    Not only did the contemplated relief fail to adequately compensate

13  Vehicle owners on its face, Land Rover was aware that it directly violated its own

14  warranty, which expressly required full reimbursement for the tire damage caused

15  by the Vehicle defect.  (Grenon Decl. at Ex. 14.)

16        31.    In connection with discussions regarding the appropriate level of

17  reimbursement, Ms. Lutz acknowledged in a telling email that Land Rover's

18  blatant disregard of its express warranty obligations was nothing more than a crass

19  cost-saving measure:

20      the pro-rated tire reimbursement formula stated in the bulletin is
    already contrary to warranty policy. (I've attached the excerpt from
21  the Warranty P+P manual that addresses sublet repairs and tire
    reimbursement resulting from a failure of a covered component on the
22  vehicle.)  In short, we would normally pay 100% of the tire
    reimbursement in this case.  The current pro-rated structure
23  presented in the bulletin was the result of an effort to try to contain costs.

24  (Grenon Decl. at Ex. 14.)

25        32.    This email elicited responses which only serve to confirm that Land

26  Rover disregarded its warranty obligations solely for the purpose of saving money.

27  Mr. Clarke's response was telling:  "Up to 18,750 miles worth of tire usage for

28

CASE NO. 8:07-cv-0627-AG-RNB      PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION      Page -11-

free?  Not sure the UK will agree to pay that?" (Grenon Decl. at Ex. 14.)  Ms. Lutz, confirming that the decision making was based on monetary considerations, responded as follows: "Understood.  That's why I mentioned to you and [Mr. Krumholz] to put the graduated pay scale in the bulletin to get it past the cost control gods in the UK." (Grenon Decl. at Ex. 14.)

33.     In strikingly similar fashion, Mr. Krumholz responded to Ms. Lutz's email by stating: "Not sure how this made it through the bulletin review here and in the UK...  Not sure how to progress this one but the estimated incremental costs are below." (Grenon Decl. at Ex. 15.)  Mr. Krumholz, in the same email, then proceeded to perform calculations to determine what the additional incremental cost to Land Rover would be if it actually complied with its warranty obligation:

> Estimated incremental claim cost if tires reimbursed at 100%
>
> Assumption - average replacement mileage = 7,500 to 10,000, 2x tires replaced
>
> Incremental cost per claim - $170.28 - this is the current customer contribution on a 70:30 prorate
>
> Total incremental cost - require estimated failure rate

[Grenon Decl. at Ex. 15; *see also* Grenon Decl. at Ex. 22 (estimating cost to provide reimbursement for two tires for certain of the Vehicles as $39,559,740, based on certain assumptions).]

34.     Ms. Lutz's analysis was entirely consistent with that of others within Land Rover.  In an April 24, 2006 email to Ms. Lutz, Daniel Lindewurth ("Mr. Lindewurth") stated: "Our long established policy on tires is that tire defects are NOT covered by [Land Rover].  If, however, a covered fault causes a wear issue on one or more tires, those tires are covered as a resultant damage." (Grenon Decl. at Ex. 5.)  A similar sentiment was expressed in an email exchange between Chandler Magoon ("Mr. Magoon") and Mr. Clarke, in which they stated: "The repair is warranty since the causal part is the alignment" and "Chandler is correct

1    ... We have a known factory defect causing misalignment and premature tire

2    wear." (Grenon Decl. at Ex. 3.)

3        35.    Perhaps not surprisingly, Land Rover acknowledged that Ms. Lutz's

4    interpretation of the warranty policy was a "more expensive" interpretation for

5    Land Rover. (D. Krumholz Dep. at 34:16-18.)

6        36.    Land Rover's decision to choose cost considerations over its legal

7    obligations was echoed by other employees, including during a conversation

8    recounted by Thomas Kennedy ("Mr. Kennedy"), an Iowa resident and then

9    Vehicle owner, and Leo McAdams ("Mr. McAdams"), a Land Rover Aftersales

10   Market Manager ("AMM"). Mr. Kennedy, having experienced premature and

11   uneven wear on ten (10) tires in a twenty-one (21) month period, made an

12   appointment with his Land Rover dealership in or about September 2007 because

13   he was told that Mr. McAdams would be present. (Kennedy Decl. at ¶¶ 4, 6.)

14   While discussing the tire wear issue, Mr. McAdams could not provide Mr.

15   Kennedy with any assurance that the defect causing the tire wear had been

16   permanently fixed or addressed in the LR3 Vehicles. (Kennedy Decl. at ¶ 8.)

17       37.    Mr. McAdams then told Mr. Kennedy that Ford Motor Company

18   ("Ford") was in the process of selling Land Rover and did not want to spend the

19   money necessary to fix the tire wear problem because it would involve replacing

20   suspension parts that were much more costly to the company than simply aligning

21   the Vehicles in an effort to reduce tire wear. (Kennedy Decl. at ¶ 7.) Ultimately,

22   Mr. McAdams offered Mr. Kennedy a $3,000 discount off of an LR2, which Mr.

23   McAdams specifically stated was not suffering from the uneven tire wear problem.

24   (Kennedy Decl. at ¶ 9.) Although Mr. Kennedy knew that he could receive more

25   for his Vehicle if he sold it on the private market, he accepted Mr. McAdams'

26   offer because he did not feel right about selling the Vehicle with the unresolved

27   tire wear issue to another consumer (in other words, he did not want to do to

28

CASE NO. 8:07-cv-0627-AG-RNB        PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION      Page -13-

1  someone else, that which had been done to him by Land Rover).  (Kennedy Decl.

2  at ¶ 11.)

3      38.    Mr. McAdams is well aware of the scope of the tire wear issue and

4  the inadequacy of Land Rover's response.  In his capacity as one (1) of

5  approximately twenty-five (25) AMMs for Land Rover, he acknowledged that he

6  deals with one (1) or two (2) inquiries per day from Vehicle owners and lessees

7  who fall outside of the service bulletin but, nonetheless, are understandably

8  seeking some type of reimbursement for premature and uneven tire wear.  (L.

9  McAdams Dep. at 40:1-3; 77:11-19.)

10     39.    In addition to violating its warranty, Land Rover's provision of

11  limited reimbursements up to 18,750[4] Vehicle miles was contrary to its own stated

12  position that the tires should reasonably be expected to have a useful life of at

13  least 30,000 miles. [*See* Grenon Decl. at Ex. 11(*pro rata* formula assumes a

14  30,000 miles useful life).][5]

15     40.    Land Rover elected to utilize a useful life of 30,000 miles for

16  purposes of calculating reimbursement even though it was aware, and had

17

18  ———————————

   [4]Plaintiff's counsel filed an action on behalf of California Vehicle owners
19  and lessees in November 2006. On January 19, 2007, Mr. Krumholz circulated an
   email in which he linked a California news article describing the lawsuit. (Grenon
20  Decl. at Ex. 18.)  On or about June 26, 2007, Land Rover modified its service
21  bulletin to provide for 100% reimbursement up to 15,000 miles and 75%
   reimbursement between 15,000 and 20,000 miles. (Grenon Decl. at Ex. 19.)  Land
22  Rover rejected any suggestion that its customers be notified of the potential for
23  reimbursement:  "C. Mitchell feels zero obligation to contact all owners."
   (Grenon Decl. at Ex. 20.)
24

25     [5]It bears noting that, despite assuming a useful life of 30,000 miles, Land
   Rover's programs, to date, fail to provide consumers with any reimbursement
26  when they discover uneven or premature tire wear after 20,000 miles and/or
27  manage to obtain use of the tires with uneven and premature tire wear beyond
   20,000 miles of usage.
28

1   discussed internally, the fact that "customers in the North American market

2   typically expect a 40,000 mile life expectancy." (D. Krumholz Dep. at 45:20-24;

3   Grenon Decl. at Ex. 21.)

4        41.   Cost considerations, again, appear to have been the sole motiving

5   factor, as Mr. Krumholz acknowledged that selecting a useful life of greater than

6   30,000 miles would have increased the cost to Land Rover. (D. Krumholz Dep. at

7   46:22-25; 47:1-19.)

8   **II.   PLAINTIFF WOLIN'S EXPERIENCE**

9        42.   Wolin purchased a new 2005 LR3 from a franchised Land Rover

10  dealer in Palm Beach, Florida in January 2006. (Complaint at ¶ 5.) By the Fall of

11  2006, the stock Goodyear Wrangler HP 225/60R18 tires placed on Wolin's

12  Vehicle had noticeably been wearing prematurely and unevenly. (Complaint at ¶

13  12.)

14       43.   Plaintiff subsequently took his Vehicle to the dealership on four

15  additional occasions for servicing and, each time, mentioned the uneven and

16  premature tire wear. (Complaint at ¶ 13.) In January 2007, as a result of the

17  uneven and premature tire wear, all four tires on Plaintiff's Vehicle had to be

18  replaced at only 15,650 miles. (Complaint at ¶ 13.)

19       44.   Land Rover initially refused to pay for the cost of replacing the four

20  tires and Plaintiff was told by the service manager that it would be too costly for

21  the dealership or Land Rover to send notice to all consumers concerning the

22  uneven and premature tire wear on the Vehicles. (Complaint at ¶ 13.) Ultimately,

23  Land Rover, through the dealership, prorated Plaintiff's invoice for the tires,

24  resulting in him still being required to pay $375.00 for four new tires for the

25  Vehicle. (Complaint at ¶ 14.) With 34,000 miles on his Vehicle, Wolin was again

26  experiencing uneven and premature wear and again would need to replace his

27  tires. (Wozniak Decl. at ¶ 12.)

28

45.     Plaintiff's expert, Robert Wozniak ("Wozniak"), undertook an extensive analysis of the alleged defect in this action.  In addition to inspecting eight (8) Vehicles, including Wolin's Vehicle, Wozniak also inspected additional tires and service records of Vehicle owners and lessees.  In addition, Wozniak also reviewed thousands of Land Rover documents and the deposition testimony of all of the Land Rover representatives deposed by Plaintiff's counsel, in order to gain a broad understanding of the alignment geometry defect at issue and Land Rover's handling of that defect.  (Wozniak Rebuttal Decl. at ¶ 12.)

46.     Based on his review and analysis, Wozniak concluded that there was a common alignment geometry defect with the Vehicles resulting in premature and uneven tire wear.  (Wozniak Rebuttal Decl. at ¶¶ 12, 17.)  Wozniak's conclusion is entirely consistent with Land Rover's own conclusions and internal documents.

47.     The tire wear experienced by Wolin's Vehicle is precisely the type of uneven and premature wear experienced by the other Vehicle owners observed by Wozniak and is consistent with the alignment geometry defect identified by Land Rover.  (Wozniak Decl. at ¶ 14.)

48.     Land Rover challenges Wozniak's testimony and the typicality and adequacy of Wolin as a class representative on the basis that Wolin's most recent tire wear has been categorized as "heel to toe" wear and by arguing that Wozniak admitted that the defect at issue does not cause "heel to toe" wear on tires.  Defendant's argument, however, is unpersuasive.  As Land Rover effectively ignores, during his deposition, Wozniak specifically testified that the toe of the Vehicles, in connection with the camber of the Vehicles, could result in "heel to toe" premature/wear, as observed on Wolin's Vehicle. [*See* Willen Decl. at Ex. 3 (Wozniak Dep. at 69)("[y]ou have testified that it's consistent with a certain type of toe setting [and] [y]ou have testified that it's consistent with a certain type of camber setting").]  Moreover and importantly, Land Rover's own documents

1   (produced after Wozniak's initial Declaration and deposition) specifically identify

2   "heel to toe" wear as associated with the defect at issue in this litigation:

3    From market feedback two distinct tyre wear patterns are
 developing.  (LRUK00144194)

4

5    These have been classified by Goodyear as being 'heel
 and toe' and 'facet' wear.  (LRUK00144194)

6

7    Tyres develop noise due to their wear patterns.  All tyres
 wear each block in an uneven manner with the rear of the
 block wearing more than the front....  (LRUK00144195)

8

9    Dependant upon the repeat pattern and block lengths this
 can degenerate into 'facet wear'.  Facet wear is generally
 described as cupping and this can lead to customer noise

10   issues.  ***Facet wear is always preceded by heel and toe
 wear***.  (LRUK00144195)(emphasis added)

11

12   This hypothesis has been agreed with by Goodyear.
 (LRUK00144195)

13   So far no data contradicts this hypothesis.
 (LRUK00144195)

14

15   Suspension geometry, toe and camber, can accelerate the
 onset of heel and toe and subsequent facet wear

16    - Facet wear is generated on the lightly
  loaded side of the tyre - ***the combination of***

17    ***toe and negative camber appears to be***
  ***significant*** (LRUK00144196)(emphasis

18    added)

19   L319 (i.e., LR3) is cupping earlier .... link to toe out and
 negative camber....  (LRUK00144201)

20

21   Link between uneven wear and irregular wear
 (LRUK00144203)

22   Results obtained so far demonstrate that the toe by
 generating more slip and the camber by reducing locally

23   the pressure are encouraging uneven wear of the tread
 blocks. - Goodyear presentation (LRUK00144203)

24

25   The assumption is that more toe out and negative camber
 increase the propensity to cup.  (LRUK00144203)

26   Review toe values on L319 [LR3]... to reduce the speed
 of heel and toe wear (LRUK00144204)

27

28

CASE NO. 8:07-cv-0627-AG-RNB  **PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**  Page -17-

1    (*See* Mauriello Decl. at Ex. 2.)  Thus, the record actually establishes that Wolin's

2    Vehicle experienced a kind of tire wear that Land Rover itself specifically

3    attributed to the alignment geometry defect at issue in this case.  In fact, in an

4    effort to address heel to toe wear on the Vehicles, Land Rover specifically

5    determined that it would review the "toe values" on the Vehicles.

6    **III.    LAND ROVER'S EXPERT**

7        49.    Land Rover's opposition to class certification relies heavily on the

8    expertise and opinions of its expert, John W. Daws ("Daws"), upon which Land

9    Rover bases its assertions that (1) tire wear issues are not amenable to class

10   treatment; (2) the opinion of Wozniak regarding the existence of a common defect

11   is inaccurate; and (3) Wolin is somehow not a typical Class member.

12       50.    As has become clear through discovery, however, Land Rover failed

13   to provide Daws with any meaningful or relevant documents or evidence regarding

14   the defect at issue and, as such, Daws' opinions are not particularly persuasive.

15       51.    Daws has admittedly been retained by Land Rover in at least four (4)

16   separate matters and has been retained by Ford, Land Rover's parent corporation

17   at the time of his engagement, on more than one hundred (100) occasions in the

18   past six (6) or seven (7) years alone.  (J. Daws Dep. at 38-42.)

19       52.    Daws has never testified on behalf of a plaintiff in a class action and,

20   despite the numerous engagements by Land Rover and Ford, among others, has

21   never rendered an opinion or testified to the existence of (1) a common defect in a

22   tire or vehicle; (2) a design defect in a vehicle or class of vehicles; (3) a

23   manufacturing defect causing tire wear in a vehicle or class of vehicles; or (4) a

24   design defect with a tire causing tire wear.  (J. Daws Dep. at 61-63.)  Furthermore,

25   Daws has never testified as an expert or rendered an opinion regarding alignment

26   geometry and has never testified against a vehicle manufacturer on behalf of a tire

27   manufacturer.  (J. Daws Dep. at 61-63.)

28

53.    In the course of his analysis in this case, Land Rover failed to provide Daws with any of the critical documents in this case which explain, *inter alia*, the defect at issue, the steps taken by Land Rover to address the defect and the pervasive and uniform nature of the defect and manner in which Land Rover addressed the defect.

54.    Although Daws was retained to review Wozniak's findings and provide a rebuttal (J. Daws Dep. at 37-38), the categories of documents that were never provided to him, never requested by him and, thus, never considered by him in reaching his conclusions, are significant.  Specifically, Daws did not review (1) the class certification papers (with the exception of Wozniak's Declaration); (2) any internal Land Rover documents regarding the nature and scope of the defect and the warranty coverage considered for the defect or the depositions of Land Rover's witnesses regarding these subjects (including the documents and deposition transcripts upon which Wozniak specifically relied in reaching his conclusions, even though Daws was hired in an effort to rebut Wozniak); and (3) the Sherrey Declaration, which sets forth, *inter alia*, the multitude of adjustments made by Land Rover to factory settings in an attempt to remedy the tire wear caused by the alignment geometry defect. (J. Daws Dep. at 88-99.)  Moreover, Daws never spoke to any of the myriad of employees whose positions included day-to-day involvement with the alignment geometry defect and, in fact, was not even aware of the identity of those individuals.  (J. Daws Dep. at 88-99.)

55.    To the extent that Daws elected to review any materials (for example Wolin's deposition transcript), he outsourced that work to his daughter, who has no legal training or experience with tire wear issues. (J. Daws Dep. at 73-75.)

56.    A telling admission by Daws regarding the lack of consideration that he gave seminal documents and evidence in rendering his opinion occurred when Daws was questioned regarding the service bulletins issued by Land Rover to its

1    authorized dealerships, which specifically detailed the uniform repair that

2    dealerships were to perform in an effort to address the defect at issue in this

3    litigation.  When questioned about these critical repair documents, Daws stated

4    that such information was not material to his opinion:

Q.    As you sit here today, you don't know what a dealership, what
      type of work a dealership was to perform under the TSB or
      service bulletin?

A.    No, not in detail no.

Q.    Did you ever request that information from Land Rover?

A.    It's in the documents.  Again, I was retained to look at Mr.
      Wozniak's opinions and to provide input to that along the lines
      of those opinions.  I was not retained to study the warranty
      policy and look at what a dealership was supposed to do or not
      supposed to do.

Q.    In the context of rendering your decision, you didn't view
      material as to what work was to be performed by the dealership
      in connection with replacing the uneven tires.  Is that correct?

A.    Well, I read the TSBs.  Did I make detailed notes of them?  Did
      I analyze them?  No, in terms of the warranty coverage.

Q.    So you didn't view that information as material to your
      declaration.  Is that correct?

A.    That's correct.

18   (J. Daws Dep. at 134-135.)

19        57.    It is within this paradigm that Land Rover's reliance on Daws'

20   opinions regarding certification should be viewed -- that is, Daws' "opinion"

21   cannot be afforded credence -- since it is based on a refusal to consider critical

22   evidence and, instead, in sum, is based upon platitudes and generalities unrelated

23   to the facts of this case.

24        58.    Based on Daws' review of the exceedingly limited and selective

25   materials, he concluded that Wolin's Vehicle is suffering from a type of uneven

26   tire wear (heel-toe wear) that is purportedly different than the uneven tire wear

27   caused by the alignment geometry defect.  In connection with this conclusion,

28

1   Daws posits that, since Wolin reported experiencing noise and vibration with his

2   tires, that his tire wear could not be attributed to an alignment defect. But, tire

3   noise and vibration is the very symptom that first led Land Rover to investigate

4   and diagnose the defect at issue and, as reflected above, appears to relate directly

5   to the defect at issue. (*See* Mauriello Decl. at Ex. 2.) Daws' conclusions,

6   therefore, do not provide a basis to deny class certification.

7        59.    Equally unavailing is Land Rover's attempt to attribute uneven wear

8   to a number of potential factors unrelated to the alignment geometry defect. As

9   Daws was required to acknowledge, driving in different conditions (hot and cold),

10   driving on different road surfaces, aggressive driving and other driving habits

11   (such as panic breaking) would not cause uneven wear absent an alignment issue.

12   (J. Daws Dep. at 116-122, 140-141.)

13        60.    In the first instance, Daws' conclusion that alignment issues cannot

14   cause heel-toe wear is simply wrong and is repudiated by tire wear literature

15   (including literature by experts upon whom Daws himself relies). (Wozniak

16   Rebuttal Decl., ¶¶ 4-9.) Indeed, even Daws was forced to acknowledge that he has

17   seen instances where heel-toe wear was caused by alignment issues. (J. Daws

18   Dep. at 133.)

19        61.    Daws' finding also is directly repudiated by additional literature

20   authored by Larry Carley, an individual upon whom Daws specifically relies in

21   connection with the opinion he rendered in this matter. (Wozniak Rebuttal Decl.,

22   ¶¶ 6, 9; J. Daws Dep. at 86.) As Wozniak notes in his Rebuttal Declaration, the

23   heel-toe wear observed on certain Vehicles as a result of the alignment geometry

24   defect, including that of the Wolin Vehicle, could meet the requirements of the

25   service bulletins because, in fact, heel-toe wear can result in a difference in tread

26   depths between the inner and outer portions of the tire -- which is exactly what the

27   service bulletins at issue address. (Wozniak Rebuttal Decl., ¶ 11.) Thus, as a

28

1   threshold matter, Daws' position regarding heel-toe wear not being caused by

2   alignment issues is untenable, as is Land Rover's position that Wolin's tire wear is

3   atypical.

4        62.    It also is simply not surprising that Defendant's expert and Plaintiff's

5   expert disagree about certain disputed facts.  The mere existence of the disputed

6   fact does not, in any manner, impair the ability of this Court to certify these

7   claims.  Rather, it simply highlights the fact that common issues of law and fact

8   exist.  As discussed below, Plaintiff need not prove his case at this time.  Whether

9   the alignment defect was causing the uneven tire wear experienced by Wolin and

10  thousands of other Class members is a common issue of fact, which clearly is

11  amenable to treatment on a Class-wide basis.

12       63.    In analyzing the impact of the geometry alignment defect on the

13  Vehicles, Land Rover itself reached conclusions that are diametrically opposite of

14  those rendered by Daws regarding the cause and nature of the wear.  Specifically,

15  Land Rover's documents reflect the following internal findings:

16       •    Suspension geometry, toe and camber, can accelerate the
            onset of *heel and toe* and subsequent facet *wear*;
17

18       •    Results obtained so far demonstrate that the toe by
            generating more slip and the camber by reducing locally
19           the pressure are encouraging *uneven wear of the tread*
            *blocks*; and

20       •    The assumption is that more toe out and negative camber
            increase the propensity to *cup.*
21

22  (Mauriello Decl. at Ex. 2 (emphasis added); Wozniak Rebuttal Decl., ¶ 10.)

23       64.    Importantly, having access to a tremendous amount of information,

24  personnel, data and documents -- which were never made available to Daws --

25  Land Rover reached a significantly different conclusion regarding whether the

26  admitted alignment geometry defect in the Vehicles is consistent with the tire wear

27  that Daws observed on Wolin's Vehicle.

28

65.     Daws' arguments regarding Wolin's purported typicality issues also are belied by Land Rover's own service bulletins and actions.  Daws states that Wolin is atypical because his tires were noisy, which Daws attributes to non-alignment type wear.  In making this finding, however, Daws simply did not consider the internal Land Rover documents that reflect that, in investigating the alignment geometry, customer complaints of noise were specifically identified -- because he apparently was not provided with them.

66.     As Daws was apparently unaware, the following representative feedback was received by Land Rover from its authorized dealerships:

•       The noise caused by the cupping is the main problem with Good Year tires; and

•       Seeing premature tire wear and tire noise on both front and rear.

(Grenon Decl. at Ex. 12.)

67.     As Daws was required to ultimately acknowledge, the service bulletins and technical service bulletins that Land Rover issued to its authorized dealerships expressly articulated (1) the uniform manner in which warranty coverage (albeit insufficient coverage) was to be provided; (2) the uniform repair that was to be implemented to address the geometry defect; and (3) do not exclude coverage for those tires that experienced noise or tires that caused vibration.  (Grenon Decl. at Exs. 2, 11, 13; J. Daws Dep. at 125.)  Furthermore, the service bulletins specifically contemplate, and provide for replacement, of tires that are unevenly worn on the inside *or outside* edges -- a fact that plainly surprised Daws at his deposition.  *Id.*  It appears that Daws' conclusion that heel-to-toe wear was not related to the defect at issue was based, at least in part, on his misunderstanding that the alignment geometry defect at issue only manifested itself on the inner edge of the tires.  (*See* Mauriello Decl. at Ex. 2 - LRUK00144199 -- observing that heel and toe wear was generally manifesting itself on the outer edge of the tires.)  Moreover, in recognition that Wolin's tires

1   were wearing unevenly and prematurely as a result of the alignment defect, Land

2   Rover did not require him to pay for certain of the replacement tires.  As set forth

3   herein, however, Wolin was required to go out-of-pocket and, thus, has been

4   damaged as a result of Land Rover's conduct.  Recognizing that Plaintiff has

5   suffered actual loss, Land Rover did not challenge the sufficiency of Plaintiff's

6   Complaint.  In sum, Land Rover's own testimony and documents produce clear

7   and convincing proof, *inter alia*, that (1) the Vehicles suffer from a uniform

8   defect; (2) Land Rover had specific knowledge of that defect; (3) Land Rover

9   failed to disclose the defect; (4) Land Rover refused to provide full reimbursement

10   for the damages caused by the defect, as required by its warranty and applicable

11   law; and (5) the claims are exceptionally well-suited for class treatment.

## [PROPOSED] CONCLUSIONS OF LAW

### IV.    STANDARD FOR CLASS CERTIFICATION

14        68.    A plaintiff seeking to represent a class must first satisfy the

15   requirements of Rule 23(a) of the Federal Rules of Civil Procedure, by showing

16   that: (1) the Class is so numerous that joinder of all members is impracticable; (2)

17   there are questions of law or fact common to the Class; (3) the claims of the

18   representative parties are typical of the claims of the Class; and (4) the

19   representative parties will fairly and adequately protect the interests of the Class.

20   Fed. R. Civ. P. 23(a).  In addition, the plaintiff must show that the case can

21   proceed as a class action under subparts (1), (2), or (3) of Rule 23(b).  Plaintiff's

22   action satisfies these requirements.

23        69.    In deciding a motion for class certification, the Court must avoid

24   pre-judging the merits, and must assume the truth of the substantive allegations of

25   Plaintiff's complaint.  *See Eigen & Carlisle v. Jacqueline*, 417 U.S. 156, 177-78

26   (1974); *see also Burkhalter Travel Agency v. MacFarms Intern., Inc.*, 141 F.R.D.

27   144, 152 (N.D. Cal. 1991).  It also is well established that the Court's decision to

28

1   grant class certification lies within its sounds discretion. *See Gulf Oil Co. v.*

2   *Bernard*, 452 U.S. 89, 100 (1981). Moreover, any doubts about whether to certify

3   a class should be resolved in favor of certification. *Joseph v. General Motors*

4   *Corp.,* 109 F.R.D. 635, 638 (D. Colo. 1981) ("Because the class certification is

5   subject to later modification, the court should err in favor of, and not against, the

6   maintenance of the class action.") In sum, Plaintiff need not prove his case at this

7   time in order to secure class certification.

8        70.   Here, Plaintiff proposes the following Class:

9             **Class**:

10            All current and former owners and lessees of model year
             2005 and 2006 Land Rover LR3s purchased or leased in
11            the State of Florida.

12  Excluded from the Class definition are the officers and employees of Land Rover

13  and its parent corporation, as well as any judge to whom this action is assigned.

14  The Class that Plaintiff proposes clearly meets the objective criteria and all of the

15  requirements of Rule 23 of the Federal Rules of Civil Procedure.

16  **V.     THE ELEMENTS OF CLASS CERTIFICATION ARE SATISFIED**

17         **A.     Joinder Of All Class Members Is Impracticable**

18        71.   To satisfy the Rule 23(a)(1) requirement that joinder of all members

19  of the Class is impracticable -- commonly referred to as "numerosity" -- "[t]he

20  exact size of the class need not be known so long as general knowledge and

21  common sense indicate that it is large." *Doe v. Los Angeles Unified Sch. Dist.*, 48

22  F.Supp.2d 1233, 1239 (C.D.Cal. 1999). Here, Plaintiff has presented evidence

23  that, at a minimum, several thousand Vehicles were sold and leased in Florida and

24  Land Rover has not contested this element. (Grenon Decl. at Exs. 22 and 23.)

25  Hence, the numerosity requirement is clearly satisfied. *Ikonen v. Hartz Mountain*

26  *Corp.*, 122 F.R.D. 258, 262 (S.D.Cal. 1988) ("classes of 20 are too small, classes

27  of 20-40 may or may not be big enough depending on the circumstance of each

28

1  case, and classes of 40 or more are numerous enough"); 1 Herbert B. Newberg &

2  Alba Conte, Newberg on Class Actions § 3.05 at 247 (4th ed. 2002) ("[A]s few as

3  40 class members should raise a presumption that joinder is impracticable").

4  Moreover, as discussed below, notwithstanding the size of the Class, it is not too

5  numerous to manage effectively.

6      **B.**    **Common Issues Exist And Predominate**

7      72.    To fulfill the commonality prerequisite, a plaintiff must establish that

8  there are questions of law or fact common to the Class as a whole.  Rule 23(a)(2).

9  The commonality element, however, does not require that the claims of every

10  Class member present identical questions.

11      73.    The commonality element is readily met and is satisfied even if

12  plaintiffs share one common issue of law or fact and their "'situations are

13  sufficiently parallel to insure a vigorous and full presentation of all claims for

14  relief.'" *California Rural Legal Assistance. Inc. v. Legal Servs. Corp.*, 917 F.2d

15  1171, 1175 (9th Cir. 1990)(internal quotations omitted); *see also* 1 Herbert B.

16  Newberg & Alba Conte, Newberg on Class Actions § 3.10 at 274-278 (4th ed.

17  2002) ("Rule 23(a)(2) is easily met in most cases [and] [w]hen the party opposing

18  the class has engaged in some conduct that affects a group of persons and gives

19  rise to a cause of action, one or more elements of that cause of action will be

20  common to all of the persons affected.").

21      74.    Thus, variations among Class members' circumstances do not defeat

22  class certification.  Instead, the commonality inquiry "focuses on the relationship

23  between the common and individual issues [and] [w]hen common questions

24  present a significant aspect of the case and they can be resolved for all members of

25  the class in a single adjudication, there is clear justification for handling the

26  dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler*

27  *Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citations and quotations omitted).

28

CASE NO. 8:07-cv-0627-AG-RNB      **PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**    Page -26-

1   Since there is a substantial overlap in the elements of Plaintiff's claims, they all

2   generally share the same common questions and will be established by the same

3   common proof.

4        75.    It is evident that once Land Rover became aware that it had marketed

5   and sold defective Vehicles that were causing damage covered by Defendant's

6   written warranty, it failed and effectively refused to take any action to notify

7   consumers of the defect or to provide them adequate reimbursement.  Plaintiff

8   seeks relief for breach of express warranty, violations of the Florida Deceptive and

9   Unfair Trade Practices Act ("FDUTPA"), F.S.A. § 501.201 *et seq.*, and, in the

10  alternative, for unjust enrichment.

11       76.    With respect to Plaintiff's breach of express warranty claim, he

12  asserts, quite simply, that Land Rover's written warranty (which it is undisputed

13  was uniform and covered all Vehicles) was breached by Land Rover's refusal to

14  (1) reimburse Class members in full for the replacement of prematurely and

15  unevenly worn tires; and (2) for failing to correct the defect.  As set forth above,

16  the warranties provided to all Vehicle owners and lessees were identical and, as

17  such, the issue as to whether or not Land Rover was obligated to reimburse for the

18  tires and repair the defect is one that is clearly susceptible to proof on a Class-wide

19  basis.

20       77.    Land Rover's arguments against certifying the breach of  warranty

21  claim are not persuasive.

22       78.    Land Rover first asserts Plaintiff cannot sustain an express warranty

23  claim because Land Rover purportedly provided him (and all Class members) with

24  a limited warranty.  Remarkably, however, Land Rover makes this assertion

25  without noting the following language contained in the warranty:

26       This New Vehicle Limited Warranty **is the only express warranty
         applicable to your vehicle**. Land Rover North America, Inc., neither
27       assumes, nor authorizes anyone to assume for it, any other obligation
         or liability in connection with this warranty.

28

1   (Willen Decl. at Ex. 7)(Emphasis added).  Thus, on its face, Land Rover's

2   warranty is an express warranty.

3       79.    Moreover, under Florida law, it is clear that a written manufacturer's

4   warranty (even if it is a limited warranty, as Land Rover contends), is actionable

5   under an express warranty claim.  *See Fischetti v. American Isuzu Motors, Inc.,*

6   918 So.2d 974 (Fla.App. 2005).  In *Fischetti,* the Court overturned the entry of

7   summary judgment in favor of the manufacturer, and specifically held that the

8   consumer could proceed with an express warranty claim against the manufacturer.

9   918 So.2d at 976.  The Court made this determination, even though the warranty at

10  issue was a "limited warranty."  *Id.*  Thus, contrary to Land Rover's assertion, it is

11  established that a written warranty between Wolin (and Class members), even if

12  characterized as a "limited warranty," gives rise to an express warranty claim

13  under Florida law.

14      80.    The cases upon which Land Rover relies do not support its position.

15  In *Frank Griffin Volkswagen, Inc. v. Smith,* 610 So.2d 597, 607 (Fla.App. 1992),

16  the issue before the Court was whether the manufacturer's warranty extended to

17  the dealership, which analysis has no application here.  Similarly unavailing is

18  Land Rover's reliance on *Hobco, Inc. v. Tallahassee Associates,* 807 F.2d 1529,

19  1533 (11th Cir. 1987), where the issue before the Court was whether a seller's state

20  of mind may become the subject of a warranty.  Again, there is simply no such

21  issue present in this case.  Lastly, *Bailey v. Monaco,* 350 F.Supp.2d 1036 (N.D.Ga.

22  2004), actually confirms the obligation of the manufacturer to repair or replace the

23  defective parts covered by a limited warranty, which Plaintiff here has specifically

24  alleged Land Rover failed to do on a uniform and Class-wide basis.

25      81.    Land Rover's argument that its warranty does not contain an

26  affirmation or promise also is unpersuasive.  On the contrary, the warranty

27  specifically provides:

28

1    Land Rover North America, Inc., warrants that during the warranty
2    period, if a Land Rover vehicle is properly operated and maintained,
     repairs required to correct defects in factory-supplied materials or
3    factory workmanship will be performed without charge upon
     presentment for service; any component covered by this warranty
4    found to be defective in materials or workmanship will be repaired, or
     replaced, without charge.

5  (Willen Decl. at Ex. 7.)

6       82.    Although Land Rover goes to great lengths to confuse the breach of

7  warranty issue, its papers actually confirm that certification is appropriate by

8  acknowledging that (1) it provided Wolin and all Class members with a written

9  warranty; (2) the warranty covered tire wear caused by a defect with the Vehicles;

10  and (3) Land Rover is required to repair any Vehicle defect. (Cert. Opposition at

11  12, 20.)  The dispute here simply pertains to (1) the extent and scope of coverage

12  under the warranty and (2) whether Land Rover has failed to adequately repair the

13  Vehicle defect.  Thus, these straightforward disputed issues are common to all

14  Class members and readily lend themselves to certification.

15       83.    To the extent that Land Rover can be understood to argue that a

16  breach of written warranty case can never be certified, the Court notes that, under

17  the federal Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312 (1998),

18  Congress created a private cause of action for breach of written warranty and

19  explicitly provided for class action claims to be brought for such breaches of

20  warranty. *Milicevic v. Fletcher Jones Imports, Ltd.*, 402 F.3d 912 (9th Cir.

21  2005)(Magnuson-Moss Warranty Act created private cause of action for a

22  warrantor's failure to comply with the terms of a written warranty); 15 U.S.C. §

23  2310(d)(3)(C)(providing for right to bring claims for breach of warranty through a

24  class action).  It would be logically inconsistent for the Court to conclude that, in

25  the face of this Congressional mandate, a breach of warranty class action could not

26  be certified in this case, especially since the elements of a cause of action under

27  the Magnuson-Moss Warranty Act (*i.e.*, for breach of written warranty) are

28

1   essentially the same as those asserted by Wolin under Florida State law.  *Walsh v.*

2   *Ford Motor Co.*, 807 F.2d 1000, 1016 (D.C.Cir. 1986)(discussing similarities

3   between causes of action under state law and law under Magnuson-Moss Warranty

4   Act).

5          84.    With respect to Plaintiff's FDUTPA claim, Plaintiff asserts that,

6   through its acts and omissions, Land Rover engaged in unfair and deceptive acts

7   or practices in the conduct of trade or commere.  It is undisputed that Land Rover

8   did not provide notice to Class members of the existence of the defect.  It also is

9   undisputed that the service bulletins provided to Land Rover's authorized

10  dealerships, which articulated how Vehicle owners and lessees should be

11  reimbursed (albeit insufficiently according to Plaintiff's theory) and what

12  procedures should be utilized to address the defect (albeit inadequately according

13  to Plaintiff's theory), applied uniformly to all Class members.  Thus, the FDUTPA

14  claims arise from the same course of conduct.  *See Latman v. Costa Cruise Lines,*

15  *N.V.*, 758 So.2d 699, 703 (Fla. 3d DCA 2000)(class members need not prove

16  individual representations for certification under FDUTPA); *Davis v. Powertel,*

17  *Inc.*, 776 So.2d 971, 974 (Fla. 1st DCA 2000)(same).

18         85.    Land Rover asserts that Wolin has failed to demonstrate that he has

19  sustained actual loss because of a FDUTPA violation.  (Cert. Opposition at 28.)  It

20  is clear, however, that Wolin has established that he was required to go out of

21  pocket to pay for certain replacement tires as a result of uneven wear caused by the

22  alignment geometry defect and, as such, has suffered an actual loss in this respect.

23  (Complaint at ¶ 14.)

24         86.    As Land Rover acknowledges, Plaintiff also has asserted that he,

25  along with Class members, has suffered damages by way of diminution in value of

26  the Vehicles as a result of the defect.  Recognizing that this category of damage is

27  also common to all Class members, Land Rover seeks to diminish this fact by

28

1  intimating that diminution only could be determined on a case by case basis.  On

2  the contrary, of course, such a calculation could readily be performed on an

3  aggregate, Class-wide basis by a forensic expert.  *See* 3 Newberg on Class Actions

4  § 10.5 at 483-487 (4th ed. 2002)(there is a growing trend in favor of using

5  aggregate damages trials); *In Re Sugar Industry Antitrust Litigation*, 1976 WL

6  1374, *27 (N.D.Ca. May 21, (it is well settled that the calculation of damages on a

7  class-wide basis is both proper and does not create manageability problems); *In re:*

8  *Chevron U.S.A., Inc.*, 109 F.3d. 1016, 1019-20 (5th Cir. 1997)("[t]he essence of the

9  science of inferential statistics that one may confidently draw inferences about the

10  whole from a representative sample of the whole"); *In re Simon II Litigation*, 211

11  F.R.D. 86, 150 (E.D.N.Y. 2002), *vacated and remanded on other grounds*, 407

12  F.3d 125 (2d Cir. 2005)("[t]he use of statistical evidence and methods in the

13  American judicial system to establish liability and damages is appropriate" in mass

14  injury cases); *Segar v. Smith,* 738 F.2d 1249, 1264 (D.C.Cir. 1984)(court

15  calculated back and front pay in Title VII case on a class-wide basis using

16  statistical methods).

17      87.    Since the tire wear at issue was caused by a Vehicle defect, at a

18  minimum, a common issue exists as to whether Land Rover was obligated to cover

19  the entire cost of the replacement tires.  Indeed, Ms. Lutz, Land Rover's Warranty

20  manager, succinctly stated "the pro-rated tire reimbursement formula stated in the

21  bulletin is already contrary to warranty policy." (Grenon Decl. at Ex. 14.)

22  Accordingly, contrary to Land Rover's argument, it is clear that Wolin has

23  suffered actual loss within the meaning of the FDUTPA.

24      88.    The cases upon which Land Rover relies to attempt to defeat class

25  certification are markedly different from this case, where Land Rover has

26  acknowledged a defect common to all Vehicles and implemented a program that

27  addresses the defect in a uniform manner.  In *O'Neill v. The Home Depot U.S.A.,*

28

1  *Inc.*, 243 F.R.D. 469, 480-481 (S.D.Fla. 2006), the Court determined that class

2  certification was inappropriate because liability was predicated on whether or not

3  consumers received certain oral representations from Home Depot salespersons.

4  Similarly, in *Marino v. Home Depot U.S.A., Inc.*, 245 F.R.D. 729 (S.D.Fla. 2007),

5  certification was denied because liability was, again, based on individual

6  representations made by Home Depot employees. *Hutson v. Rexall Sundown, Inc.*,

7  837 So.2d 1090 (Fla.App. 2003), is, likewise, unavailing, as certification was

8  denied, in part, because of a finding that individuals who read the vitamin labels

9  could not have been misled under the peculiar facts of that case.

10      89.    Land Rover's reliance on *Morris v. BMW of North America, LLC*,

11  2007 WL 3342611 (N.D.Cal., Nov. 7, 2007), is similarly unhelpful to its case.

12  Land Rover argues that, because Wolin purportedly received more than he was

13  entitled to under the applicable service bulletin, he cannot be found to have been

14  damaged.  First, Land Rover simply ignores the fact that Wolin was required to

15  pay for two tires that were worn as a result of the defect with the Vehicle.  Second,

16  Land Rover completely misconstrues *Morris*, which pertained to whether or not

17  standing existed to assert claims under the California Secret Warranty Act

18  ("Secret-Warranty Act"), Cal.Civil.Code § 1795.92.  Specifically, the Court was

19  asked to determine whether the right to receive notice under the Secret-Warranty

20  Act was a property right and, thus, conferred standing.  That issue is not present

21  here, where the damages being measured arose from Land Rover's failure to

22  comply with its warranty obligations and its fraudulent conduct.  Accordingly,

23  *Morris* does not stand for the proposition, as Land Rover incorrectly suggests, that

24  an individual who was required to go out-of-pocket to replace tires that wore

25  unevenly and prematurely as a result of a vehicle defect has not suffered actual

26  loss under FDUTPA.

27      90.    Land Rover's reliance upon *Montgomery v. New Piper Aircraft, Inc.*,

28

209 F.R.D. 221(S.D.Fl. 2002), is unavailing as well.  The Court in *Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572 (M.D. Fla. 2006)(holding that class action to recover for deceptive and unfair business practices in order to profit from the sale of window etching as security device should be certified), persuasively distinguished the *Montgomery* case in certifying a Florida only class on the following basis:

> Defendant's contention that Plaintiff's FDUPTA and Chapter 634 claim are not suitable for class certification is unpersuasive. The Fourth Amended Complaint alleges Defendant engaged in a common scheme to deceive or defraud Plaintiff, which included deceptive business practices and violations of Chapter 634. In essence, Plaintiff alleges that Defendant committed the same or very similar unlawful acts utilizing the same methodology against the entire class. While the class members may not have identical claims, Plaintiff has sufficiently established that the common questions of fact and law regarding Plaintiff's FDUPTA claim, including the issue of causation, predominate over individual issues. Moreover, "numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), *reh'g en banc denied*, 362 F.3d 739 (11thCir.2004).
>
> The cases Defendant relies in which class certification of FDUPTA claims was denied are distinguishable. *See Hutson v. Rexall Sundown, Inc.*, 837 So.2d 1090, 1093 (Fla. 4th DCA 2003); *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 229 (S.D.Fla.2001).  In both *Hutson* and *Montgomery*, the FDUPTA claims occurred in Florida and various other states. Therefore, the claims of non-resident consumers would require the application of consumer protection laws from different states.

Since the application of the laws of various states (an issue not present here) was at the center of the decision in *Montgomery*, as the Court held in *Veal*, it clearly has little or no application to a "Florida only" class action such as that present here.

91.    Finally, with respect to Plaintiff's unjust enrichment claim, "'[the essential elements that must be proven ... are a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it

inequitable for him to retain it without paying the value thereof.'" *Grillasca v. Amerada Hess Corp.*, 2006 WL 3313719 * 6 (M.D.Fla. Nov. 14, 2006)(internal quotations omitted). From the required elements of this claim, it is self-evident that the focus of such a claim is on the conduct of the defendant. *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 697 (S.D.Fla. 2004)(certifying unjust enrichment claims since they were susceptible to common proof). To the extent that Land Rover argues that an unjust enrichment claim cannot lie in the face of the breach of warranty claims, it bears noting that Land Rover has specifically disputed that any such express contract exists and the unjust enrichment claims are plainly and properly asserted in the alternative.

92. Land Rover does not present any argument as to why the unjust enrichment claim should not be certified and, based on the elements, it is clear that this claim is susceptible to common proof.

93. The cases upon which Land Rover relies to suggest that no tire wear claims ever can be certified are inapposite. In *Frosini v. Bridgestone Firestone North American Tire, LLC*, 2007 WL 2781656 (C.D.Cal. August 24, 2007), plaintiffs sought certification of a class of vehicle owners covering more than thirty (30) different models of differing types of vehicles in connection with allegedly defective tires that were produced under three (3) different plants over a six (6) year period. Here, in stark contrast, the alignment geometry of the Vehicles was identical in all material respects and the Vehicles came factory equipped with the same tires.

94. The remaining cases cited by Land Rover, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Ford Motor Co. v. McDavid*, 259 F.2d 261 (4th Cir.1958); and *Stabile v. Daimlerchrysler Corp.*, 2007 WL 1062241 (N.J.Super. April 11, 2007), all stand for the unremarkable proposition that an expert may be able to determine if vehicle alignment is correct. *Volkswagen of America, Inc. v.*

*Sugarman*, 909 So.2d 923 (Fla.App. 3 Dist. 2005), is similarly distinguishable.  In that case, the Florida state court held that individual issues regarding causation, in the case of individual, separate accidents, would necessitate mini-trials regarding how bumpers of automobiles were damaged.  Here, of course, since Land Rover has admitted a uniform defect and Plaintiff has submitted evidence of a uniform defect applicable to all Class members, such individual issues of causation simply are not present in this case.

95.    Land Rover's reliance on additional cases that purport to stand for the proposition that allegations involving motor vehicle defects are not well-suited for class certification also are distinguishable on their face.  In *In re Bridgestone/Firestone Inc.*, 288 F.3d 1012 (7th Cir. 2002), contrary to this case, there was no allegation that a uniform defect in the vehicles was causing the problems with the tires equipped on the vehicles that comprised the proposed class.  Similarly unavailing is Land Rover's reliance on three vehicle paint defect cases (*Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (S.D.Ill. 2000); *In re Ford Motor Company Vehicle Paint Litigation* ("*Ford Paint*"), 182 F.R.D. 214 (E.D.La. 1998); and *Miller v. General Motors Corp.*, 2003 WL 168626 (N.D.Ill. 2003)).  *Sanneman* and *Ford Paint* are inapposite as they involved allegations of defective paint on numerous makes and models manufactured at various plants over at least a seven (7) year period.  *Sanneman*, 191 F.R.D. at 450.  *See Ford Paint*, 182 F.R.D. at 220 ("Ford's challenged course of conduct spanned at least seven years and involved different models of vehicles, made of different materials, painted a variety of colors at different plants, using different paint formulae.").  *Miller* also provides no assistance to Land Rover.  In *Miller*, the Court was merely discussing the potential difficulties in certifying claims sought on behalf of nationwide classes.  Wolin, of course, is not seeking certification of a nationwide class here.  Lastly, *O'Connor v. Boeing North America, Inc.*, 197 F.R.D. 404 (C.D.Cal. 2000),

1  also is distinguishable.  There, the claims which plaintiffs sought to certify

2  included, *inter alia*, medical monitoring claims on behalf of certain affected

3  individuals over a fifty (50) year time span.  Such facts are, again, not present

4  here.  In sum, Land Rover continues to ignore the fact that Wolin has alleged the

5  existence of a common defect in the Vehicles that was the cause of the uneven and

6  premature tire wear.

7       96.    All of Plaintiff's claims focus upon the uniform manner in which

8  Land Rover failed to honor its warranty obligations and marketed, sold and

9  serviced the Vehicles and, whether as a result of its conduct, Defendant breached

10  its express warranty, violated the FDUTPA and/or was unjustly enriched.  As the

11  Court in *Chamberlan v. Ford Motor Company*, 402 F.3d 952, 962 (9th Cir. 2005)

12  (where the court denied a petition for interlocutory review of a class action under a

13  California consumer protection statute alleging that the defendant knowingly

14  manufactured, sold and distributed automobiles containing an engine part with a

15  uniform design defect), recently and cogently explained:

16       The district court's decision in this case is typical in that it presents
         no error of law and is not manifestly erroneous.  Although the district
17       court was succinct, it provided detailed, substantive examples of the
         common issues: (1) whether the design of the plastic intake manifold
18       was defective; (2) whether Ford was aware of alleged design defects;
         (3) whether Ford had a duty to disclose its knowledge; (4) whether it
19       failed to do so; (5) whether the facts that Ford allegedly failed to
         disclose were material; and (6) whether the alleged failure to disclose
20       violated the CLRA.  The common issues here are plain enough that
         no further explanation is required to justify the district court's
21       decision....  Requiring the district court to expand its analysis would
         produce nothing more than a lengthy explanation of the obvious.

22       97.    Similarly, here, the common issues of law and fact that predominate

23  in this action are as follows:

24       -    Whether the Vehicles had an alignment geometry defect;

25       -    Whether Land Rover was aware of the defect;

26       -    Whether Land Rover had a duty to disclose its knowledge of the
            defect;

27

28

1    -    Whether Land Rover failed to do so;

2    -    Whether Land Rover violated the FDUTPA;

3    -    Whether Land Rover violated its warranty by failing to fully reimburse owners and lessees who had to replace the premature and unevenly worn tires, or was unjustly enriched; and

5    -    Whether Plaintiff and Class members have been damaged.

98.    The documents produced by Land Rover in discovery demonstrate that the defect is uniform and common to all Class members. Any finding by a trier of fact that the Vehicles contain a defect will be applicable to all Class members. Thus, Plaintiff's theory of liability is clearly susceptible to proof on a Class-wide basis.

99.    Land Rover's argument that the Court will be required to examine individual driving habits of Vehicle owners and lessees was flatly, and properly, rejected in the scholarly opinion issued in *Samuel-Bassett v. Kia Motors America, Inc.*, 212 F.R.D. 271, 282 (E.D.PA. 2002), *vacated on other grounds*, 357 F.3d 392 (3d Cir. 2004). There, owners and lessees asserted claims, including for breach of express warranty, in connection with a defective brake system on Kia's Sephia vehicles (sold between 1995 and 2001). In certifying the class, the Court rejected Kia's argument that individual driving habits precluded a finding that common issues predominated:

> In this case, while the defendant has strenuously argued that this case does not satisfy Rule 23(b)(3) because the merits of each individual car owner's complaints must be evaluated along with their individual driving habits and conditions, we nevertheless find from the evidence amassed thus far that the questions common to the class clearly predominate over those which only affect certain individual owners. To be sure, there is but one model at issue in this case, manufactured at Kia's Korea plant.... ***While Defendant is not doubt correct that each vehicle was driven differently by different drivers in different locations and that the vehicles manifested varying symptoms such as pulsating, grinding, vibration, and failure to stop, there is nonetheless more than sufficient indicia that a vast number of those Sephias manufactured and sold between 1995 and 2001 experienced some or all of the above symptoms and were subject to the wear-out of their brake pads and rotors before reaching the 5,000 mile mark regardless of who was driving them or where or***

1    ***how they were being driven***.

2                         *       *       *

3    We thus conclude that the questions of whether the Sephia possesses
     the brake system defect alleged and whether Defendant lacks the
4    means to repair the defect or replace the defective brake system such
     as to render it liable for beach of express and implied warranties ... do
5    predominate over those issues unique to individual claims.

6    (*Id.* at 282)(Emphasis added and footnote omitted).

7         100.   In response to the *Samuel-Bassett* decision, Land Rover points to *Kia*

8    *Motors America Corp. v. Yvonne Butler*, No. 3D05-1145 (3d Dist. Ct. App. June

9    11, 2008 ("*Butler*"), **which is an unpublished decision that is subject to**

10   **withdrawal or revision on its face,** where the appellate overturned the trial court's

11   certification of a Florida class of Kia owners and lessees experiencing the same

12   brake defect as plaintiffs in *Samuel-Bassett*.  As Plaintiff notes, however, the *Butler*

13   decision is contrary to the certification granted (or upheld) by six other courts

14   (including the trial court in *Butler*) with respect to precisely the same design defect

15   at issue in *Butler*.  (*See* Supplemental Authority Response.)

16        101.   Moreover, the decision overturning the trial court's certification in

17   *Butler* is facially distinguishable from the facts present here and does not, in any

18   event, support the denial of class certification.

19        102.   The primary reason provided by the *Butler* Court for overturning the

20   certification by the trial court is not present in this case.  Specifically, the Court in

21   *Butler* determined that there were substantial differences between the various

22   model years that defeated commonality, including:

23   •   "the brake systems found in the three Kia Sephia models in this
         case are far from uniform";
24
25   •   "[t]he Kia Sephia vehicle disc brakes installed during the
         model years at issue were comprised of component parts
26       specific to that model year";

27   •   "[i]n some instances, there were component changes
         during the course of the model year";
28

- "[d]uring 1999 model-year production, the pad material was changed, the pad shim material was changed, the pad shim protector was removed, and the rotor material modified.";

- [t]he 2000 model Sephia was manufactured with a different brake pad from the prior model ... [and] the rotor thickness was changed]";

- [f]or the 2001 model-year, the Sephia's front bake system was completely redesigned. Unlike prior years, the component parts utilized on this model are not interchangeable with the parts used on the earlier models."[6]

*Butler* at p 8-9.

103.   Here, in stark contract, with respect to the Vehicles at issue in the litigation, it is undisputed that there were no differences in the design of the alignment geometry between the two model years.  Accordingly, the principle reason that the *Butler* Court denied certification is not present here.

104.   The *Butler* Court further relied upon data that reflected what it characterized as widely varying repair data for the various model years, which it indicated substantiated its view that the design changes over the various model years defeated commonality.  Here, Land Rover has not, because it cannot, present any such disparate data regarding the Vehicles. Accordingly, the *Butler* decision does not provide a basis to deny class certification of Plaintiff's claims here.

105.   Land Rover also relies upon certain language in *Butler* regarding the purported need to make individual determinations, in certain circumstances, regarding the reason for a specific brake failure.  Of course, here, Land Rover issued service bulletins that applied to all of the Vehicles and which provided for a uniform manner to address the defect.  For that reason as well, *Butler* is clearly distinguishable from the case at hand.

---

[6]In light of the overwhelming evidence of a common brake defect among the various models, those courts that certified classes based on this defect properly acknowledged that these differences did not defeat commonality.

1    106.   The Court's decision in *Butler* also is distinguishable from this case
2    because, unlike the facts in *Butler* where the alleged, defective parts were arguably
3    wearable items themselves (*i.e.*, brake rotors and brake pads), *see Butler* at *1, for
4    which there arguably could be different reasons for wear, in this case, the alleged
5    defect is in the alignment geometry of the Vehicles -- not the tires of the Vehicles
6    themselves -- and the wear patterns at issue are distinct, identifiable and
7    measurable -- as reflected in Land Rover's own documents.
8    107.   The Court's holding in *Butler* with respect to relief available in
9    individual federal warranty actions or under state lemon laws also is unpersuasive
10   since, as discussed below, *see Butler* at * 7, it fails to account for the specialized
11   nature of state lemon law statutes and engages in no analysis as to whether it would
12   be practicable for plaintiffs or their counsel to prosecute such claims on an
13   individual basis where, as here, substantial expert testimony and discovery is
14   required to adequately prepare a case on the merits.  By way of example only,
15   although it may be practical to prosecute an individual "lemon law" case on the
16   basis that a manufacturer has been unable to repair an item such as an engine or a
17   door after a number of attempts (since the defect itself is self-evident and not
18   subject to dispute), where, as here, the very existence of a defect is likely to be
19   contested and the question of whether particular tire wear is related to the defect
20   (which fact was only arguably established, here, after documents were obtained
21   from the United Kingdom), renders it both unrealistic and highly impractical to
22   expect consumers to pursue individual claims for relief to vindicate their rights.
23   108.   The Court also concludes that the federal decision in *Samuel-Bassett* is
24   simply better reasoned and more persuasive than the decision in *Butler*.  The Court
25   notes that in *Samuel-Bassett*, the Court engaged in an a detailed an exhaustive
26   analysis of applicable law and "delve[d] beyond the pleadings to determine
27   whether the requirements of class certification [we]re satisfied." *Samuel-Bassett*,
28

1    212 F.R.D. at 276.  Moreover, as in the case of *Samuel-Bassett*, the Florida lemon
2    law expressly provides that nothing in the statute shall "prohibit a consumer from
3    pursuing other rights or remedies under any other law."  F.S.A. § 681.112(3).  In
4    fact, given the short time available for a consumer to bring a claim under the
5    Florida lemon law, such a statutory savings clause that expressly permits actions of
6    this kind may be particularly important.  F.S.A. § 681.112(2).

7        109.   Any argument by Land Rover that *Butler* should be followed since it is
8    a Florida decision is unpersuasive.  Although in limited circumstances, federal
9    courts may choose to import state law requirements into a class certification
10   decision where, for example, a state's law prohibits asserting such claims on behalf
11   of a proposed class, *see In re Intel Corp. Microprocessor Antitrust Litig.*, 496
12   F.Supp.2d 404, 416-17 (D. Del. 2007), this Court is generally bound to follow the
13   requirements of Fed.R.Civ.P. 23, which the United States District Court for the
14   Eastern District of Pennsylvania did in the *Samuel-Bassett* case.  It also bears
15   noting that nothing in the *Butler* decision was unique to Florida state law; instead,
16   the *Butler* case generally relied upon federal decisions under Rule 23 – decisions
17   which, as explained above, are distinguishable from the facts at hand.

18       110.   Land Rover's attempt to distinguish *Chamberlan v. Ford Motor*
19   *Company*, 402 F.3d 952, 962 (9th Cir. 2005) (where the court denied a petition for
20   interlocutory review of a class action under a California consumer protection
21   statute alleging that the defendant knowingly manufactured, sold and distributed
22   automobiles containing an engine part with a uniform design defect), is of no
23   moment and serves to highlight the fact that in order to argue that class certification
24   is not appropriate, Land Rover is required to simply ignore all of its own internal
25   documents.  With respect to *Chamberlan*, Land Rover argues that it is distinct
26   because engines cannot fail in as many potential ways as tires.  This argument,
27   however, fails to acknowledge that Land Rover's own documents demonstrate that
28

CASE NO. 8:07-cv-0627-AG-RNB    **PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**    Page -41-

1   (1) the alignment geometry defect plaguing the Vehicles was common to the

2   Vehicles; and (2) Land Rover itself adopted and implemented a uniform policy for

3   reimbursing consumers (albeit in an insufficient manner) for tires that were

4   prematurely and unevenly worn as a result of the defect.

5      111.   Land Rover makes it very clear in its brief that this case should not be

6   certified because, in its view, no case involving a vehicle defect can ever be

7   certified.  This, or course, is not correct.  Plaintiff has asserted claims based on a

8   common defect plaguing the Vehicles which results in uneven and premature tire

9   wear.  Plaintiff further seeks damages as a result of Land Rover's conduct,

10  including its failure to comply with its warranty obligations under these

11  circumstances.  Despite Land Rover's best efforts to confuse the issues, this case,

12  involving a common Vehicle defect, should clearly be certified.

13                    1.    <u>**Manifestation In Every Vehicle Is Not Required**</u>

14     112.   Land Rover argues that certification is inappropriate because the

15  defect allegedly has not resulted in premature and uneven tire wear on all of the

16  Vehicles.  Contrary to Land Rover's position, however, there is no authority to

17  support the proposition that Plaintiff need make such an allegation or present such

18  proof at the class certification stage.  Courts have routinely made it crystal-clear

19  that where, as here, the defect is inherent in Defendant's product, the fact that the

20  defect has not yet manifested itself for each class member does not bar certification

21  of class claims.  *See In re Bridgestone/Firestone, Inc.*, 155 F.Supp.2d 1069,

22  1099-1100 (S.D.Ind. 2001) (no need to allege manifest injury to assert breach of

23  warranty claim on behalf of a class); *In re Cadillac V8-6-4 Class Action*, 43 A.2d

24  736 (N.J. 1983) (class certified where members of class included all owners of

25  engines at issue regardless of whether the problems were manifest); *Microsoft*

26  *Corp. v. Manning*, 914 S.W.2d 602, 610 (Tex.Ct.App. 1995) (class members may

27  include those who purchased the software but have not experienced a manifestation

28

1 of the defect); *Martin v. Amana Refrigeration, Inc.*, 435 N.W.2d 364 (Iowa 1986)

2 (class members included those who purchased allegedly defective furnace and

3 water heaters where all units did not fail); *Hicks v. Kauffman*, 89 Cal.App.4th 908,

4 923 and 923, n. 54 (2001), *citing Anthony v. General Motors Corp.*, 33 Cal.App.3d

5 699 (1973)(appellate division concluding that trial court erroneously limited

6 warranty claims to potential class members with homes in which a product "failed"

7 and caused "manifest damage," where allegation was that all of the concrete slabs

8 were potentially defective and noting that "[w]e doubt there are many reputable

9 scientists or engineers willing to testify they are absolutely certain of any

10 prediction about how a man-made product will function in the future").  Land

11 Rover's reliance on *Bishop v. Saab Automobile A.B.*, 1996 WL 33140020 (C.D.Cal.

12 Feb. 16, 1996), is unpersuasive because the plaintiffs in that case asserted claims in

13 strict tort liability and negligence.  *Barbarin v. General Motors Corp.*, 1993 WL

14 765821 (D.D.C. 1992), is equally unhelpful because, in *Barbarin*, the plaintiff

15 could not even demonstrate that the brake system at issue on numerous models of

16 vehicles was identical.

17      113.   Indeed, if a Court were to impose a requirement in a product defect

18 case that Plaintiff either plead, or present evidence demonstrating, that each and

19 every product in a particular line is or will manifest the defect at issue at a precise

20 point in time, it would literally serve to preclude any class action of any case as it is

21 inconceivable that any mass produced product would suffer a one-hundred percent

22 (100%) failure rate.  *Hicks v. Kauffman*, 89 Cal.App.4th 908, 923, n. 54

23 (2001)("[w]e doubt there are many reputable scientists or engineers willing to

24 testify they are absolutely certain of any prediction about how a man-made product

25 will function in the future").  Furthermore, there is no reason why Class members

26 who have received a defective Vehicle should not be permitted to obtain relief,

27 including a repair of the defect, before they necessarily experience tire wear.  The

28

CASE NO. 8:07-cv-0627-AG-RNB     PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION     Page -43-

1 evidence presented appears to reflect that all of the Vehicles may suffer from the
2 defect at issue and, accordingly, there is no reason that each and every Class
3 member should be precluded from asserting claims for relief.

4     114.   The present case is analogous to *Manning, supra*.  There, the plaintiffs
5 purchased a software program where one function was to compress data on the
6 consumer's hard drive.  *Id.* at 605.  Microsoft had marketed the program both
7 directly and through computer manufacturers "without adequate testing." *Id.*  The
8 plaintiffs sought compensation in the form of the cost of the software that they
9 were required to purchase from Microsoft to correct the defect in the program in
10 order to save their hard drives from malfunction and/or to prevent further
11 malfunction.  *Id.* at 606.  Microsoft attempted to defeat class certification (after
12 discovery) by arguing that plaintiffs who had not yet suffered damage in the form
13 of lost data rendered the claims unsuitable for class treatment.  *Id.*  The *Manning*
14 Court rejected this assertion, distinguishing certain cases relied upon by the
15 Defendant:

16         Even though the defect is not manifest today, perhaps because the user
        is not using the data compression feature, it may manifest itself
17         tomorrow.  The only way for . . . [the] buyer to avoid the possibility of
        injury is to pay for the upgrade, never use the data compression
18         feature, or use another operating system.  The buyer never gets what
        he bargained for, i.e. an operating system with an effective data
19         compression feature.

20 *Id.* at 609; *see also Hicks*, 89 Cal.App.4th at 923 ("[w]e see no reason why a
21 homeowner should have to wait for the inevitable injuries to occur before
22 recovering damages to repair the defect and prevent the injuries from occurring").

23     115.   The federal trial court in *Samuel-Bassett* specifically addressed
24 manifestation in connection with its predominance analysis and concluded that,
25 even though not all of the vehicles had manifested the defect, the action still was
26 properly certified.  *Samuel-Bassett* at 282.

27     116.   In contrast, to *Samuel-Bassett*, the Court in *Butler*, upon which Land
28

CASE NO. 8:07-cv-0627-AG-RNB      PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION      Page -44-

1  Rover places great reliance, suggests that a number of courts have denied

2  certification where not all proposed class members have products that manifested a

3  defect.  Even a cursory review of those cases upon which the Court in *Butler* relies

4  for this proposition demonstrates that the holdings are inapplicable and/or

5  inapposite.  *See Briehl v. General Motors Corp.*, 172 F.3d 623 (8th Cir.

6  1999)(upholding grant of motion to dismiss where the plaintiffs themselves failed

7  to plead that they had ever manifested the purported defect); *Angus v. Shiley, Inc.*,

8  989 F.2d 142 (3rd Cir. 1993)(dismissing intentional infliction of emotional distress

9  claims absent any allegation that a heart valve was defective and where plaintiff did

10  not allege any direct physical injury); *Willett v. Baxter Intern, Inc.*, 929 F.2d 1095

11  (5th Cir. 1991)(rejecting strict liability claims in the absence of any evidence that

12  the valves at issue performed other than as intended); *Carlson v. General Motors*

13  *Corp.*, 883 F.2d 287 (4th Cir. 1989)(dismissing damages claims for only those class

14  members who did not manifest defect and predicated claims on "poor reputation");

15  *American Suzuki v. Superior Court,* 37 Cal.App.4th 1291 (1995)(which has

16  subsequently been rejected, if not overruled, by *Isip v. Mercedes-Benz USA, LLC,*

17  65 Cal.Rptr.3d 695 (2007) (concluding that *American Suzuki* misstated

18  requirements for breach of implied warranty under California law) and *Linder v*

19  *Thrifty Oil Co.*, 23 Cal.4th 429 (2003) (holding that merits based analysis is

20  improper on class certification)); *Ford Motor Co. v. Rice*, 726 So.2d 626 (Ala.

21  1998)(dismissing claims where plaintiffs themselves had not plead any cognizable

22  injury); *Yu v. International Business Machines Corp.*, 732 N.E.2d 1173 (Ill.App.

23  2000)(denying injunction where there was no evidence of any failures whatsoever

24  and plaintiff himself had accepted an upgrade designed to ensure there was no

25  failure); *Capital Holding Corporation v. Bailey*, 873 S.W.2d 187 (Ky.

26  1994)(rejecting personal injury claims where no evidence of asbestos related

27  injury); *Chin v. Chrysler Corporation*, 182 F.R.D. 448 (D.N.J. 1998)(refusing to

28

1  certify nationwide class because of conflicting laws); *Ortiz v. Ford Motor Co.*, 909
2  So.2d 479 (Fla.App. 2005) (none of the plaintiffs had the defect manifest in their
3  vehicles); *Barbarin v. General Motors Corp.*, 1993 WL 765821 (D.D.C. 1993)(trial
4  brought by government already resulted in verdict that vehicles were not
5  defective); *Feinstein v. Firestone Tire and Rubber Co.*, 535 F.Supp. 595
6  (1982)(many of the plaintiffs themselves had not manifested the defect).

7      117.   In sum, common issues of law and fact clearly predominate because
8  Plaintiff will attempt to prove his claims through common proof regarding Land
9  Rover's uniform conduct.  All of the questions identified above compose the core
10  issues in this litigation and are susceptible to common proof.

11  **C.     Plaintiff's Claims Are Typical Of Those Of The
         Members Of The Class**
12
13      118.   Rule 23(a)(3) requires that the claims of the representative plaintiffs
   be typical of those of the Class.  Commonality and typicality "tend to merge," such
14
   that factors that support a finding of commonality also support a finding of
15
   typicality. *See General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 (1982).
16
17      119.   Plaintiff demonstrates typicality by showing that the "unnamed class
   members have injuries similar to those of the named plaintiffs and that the injuries
18
   result from the same, injurious course of conduct." *Armstrong v. Davis*, 275 F.3d
19
   849, 869 (9th Cir. 2001), cert. denied, 537 U.S. 812 (2002).
20
21      120.   The typicality requirement is satisfied where "the representative
   [p]laintiffs, as well as the members of the proposed class, all have claims arising
22
   from the fraudulent scheme perpetrated by [the defendant]." *In re Prudential Ins.*
23
   *Co. Am. Sales Practices Litig.,* 148 F.3d 283, 311 (3d Cir. 1998).
24
25      121.   Here, Plaintiff purchased a Vehicle with the same alignment geometry
   defect as all other Vehicles and suffered the same harm as that suffered by other
26
   members of the Class.  Accordingly, Plaintiff's claims are typical of those of the
27
   Class which he seeks to represent.
28

**D.**   **Plaintiff And His Counsel Will Adequately Represent
The Class**

122.   The adequacy requirement of Rule 23(a)(4) is met if a plaintiff fulfills two conditions: (a) the plaintiff's attorneys must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the Class.  *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

123.   Here, Plaintiff is represented by counsel who are qualified and possess substantial experience in the conduct of litigation of the size, scope, and complexity of this case in general and consumer class actions in particular. (Grenon Decl. at Ex. 24.)  Land Rover has not challenged the adequacy of Plaintiff's counsel.

124.   As to the second prong of the "adequacy" test, only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.  Factual differences in the merits of the named plaintiff's underlying claims do not affect the plaintiff's ability to vigorously represent the Class.  *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1997).  Here, Plaintiff does not have any conflicts with the members of the Class.  Plaintiff's injuries are essentially the same as those of the members of the proposed Class.  Plaintiff has, and will continue to, vigorously pursue relief on behalf of the proposed Class. Moreover, Plaintiff is able and willing to prosecute this case and to protect the interests of the Class.

**E.**   **A Class Action Is Superior To All Other Methods For The
Fair And Efficient Adjudication Of This Controversy And
The Action Is Manageable**

125.   Weighing heavily in favor of class certification is the fact that certification of Plaintiff's claims is the only economically feasible method for the fair and efficient adjudication of this controversy.  Any individual Class member's damages remain modest relative to the time and expense required to properly

1  prosecute these claims, as well as Land Rover's financial resources and the
2  millions of dollars generated by its sale of these Vehicles. Individual Class
3  members have no economic ability or incentive to wage costly and complex
4  litigation against a well-financed Defendant such as Land Rover.

5      126. Rule 23(b)(3) requires the court to determine whether "a class action is
6  superior to other available methods for a fair and efficient adjudication of the
7  controversy." Fed. R. Civ. P. 23(b)(3). The four specific factors listed in the rule
8  compel the conclusion that a class action is superior to resolve the claims of
9  Plaintiff and the Class.

10     127. The first factor is the interest of each member in "individually
11 controlling the prosecution or defense of separate actions." Fed. R. Civ. P.
12 23(b)(3)(A). Here, the interest of Class members in individually controlling
13 separate actions is minimal: while the aggregate damages of the Class are
14 significant, the damages of each individual Class member will be relatively small.
15 Given the expense of securing counsel and pursuing claims separately, Class
16 members have little interest in maintaining individual, non-personal actions.
17 *Hanlon,* 150 F. 3d at 1023 ("even if efficacious, these claims would not only
18 unnecessarily burden the judiciary, but would prove uneconomic for potential
19 plaintiffs [since] [i]n most cases, litigation cost would dwarf potential recovery
20 [and] [i]n this sense, the proposed class action is paradigmatic.").

21     128. Indeed, the Supreme Court has recognized that, absent class treatment,
22 similarly situated consumers with relatively small but nevertheless meritorious
23 claims for damages would, as a practical matter, have no means of redress because
24 of the time, effort and expense required to prosecute individual actions. As the
25 Supreme Court noted in *Amchem Products v. Windsor*, 521 U.S. 591 (1997), Rule
26 23(b)(3) aims primarily at vindicating "the rights of groups of people who
27 individually would be without effective strength to bring their opponent into court
28

at all." The Supreme Court declared cases like this one to be paradigms for class treatment:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. The class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem*, 521, U.S. at 617 (internal quotations omitted). This action is just such a "core" class action. Few of the present Class members could afford to undertake individual litigation against Land Rover to recover the relatively small damages at issue here, but the failure to recover such damages is a real hardship to many people. If the class action device were unavailable here, an economic injustice would result: the Class members would, as a practical matter, have no meaningful redress against Land Rover and Land Rover would be unjustly enriched by the profits gained from any misconduct proven.

129.   In light of the size of each Class member's potential claims (*i.e.*, which has been candidly estimated at this time by Plaintiff's counsel to be in the thousands of dollars and likely less than $5,000.00), as well as the time and expense associated with prosecution of complex claims of this kind, including the need for and reliance upon expert testimony as reflected in the record of this case, the Supreme Court and other federal courts have uniformly recognized that this is exactly the kind of case that is well suited for class action treatment. *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 338, n. 9 (1980)("[a] significant benefit to claimants who choose to litigate their individual claims in a class-action context is the prospect of reducing their costs of litigation, particularly attorney's fees, by allocating such costs among all members of the class who benefit from any recovery," "[h]ere the damages claimed by the two named plaintiffs totaled $1,006.00" and "[s]uch plaintiffs would be unlikely to obtain legal redress at an acceptable cost...."); *Curry v. United States*, 81 Fed.Cl. 328 (2008), *citing Amchem*

1   *Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997)("[i]f class certification were

2   denied, the Court would still be 'inundated' with thousands of claims, unless the

3   claims are too small to justify being brought individually"; "[b]ut this latter

4   prospect is one of the main justifications for class actions in the first place");

5   *Williams v. LexisNexis Research Management, Inc.*, 2007 WL 2439463 * 9

6   (E.D.Va. Aug. 23, 2007)(class action is superior where "[t]he proposed classes

7   involve at least hundreds, perhaps thousands, of proposed class members pursuing

8   identical, fairly small claims for relief, who, if required to proceed individually,

9   probably would not assert their claims"); *In re Abbott Laboratories Norvir*

10  *Antitrust Litigation*, 2007 WL 1689899 * 10 (N.D.Cal. June 11, 2007)("the

11  damages of individual consumers are likely too small to justify litigation, but a

12  class action would offer those with small claims the opportunity for meaningful

13  redress"); *see also* Silver, *We're Scared To Death: Class Certification and*

14  *Blackmail*, 78 N.Y.U. L. Rev. 1357, 1429 (Oct., 2003)("[b]y aggregating

15  hundreds, thousands, or even millions of claims, the class action can make small

16  claims viable and empower claimants in other ways" and [d]efendants dislike class

17  actions for this reason" since "[t]hey prefer single-plaintiff lawsuits in which they

18  possess significant advantages, including economies of scale and superior

19  tolerance for risk").

20      130.   The Court in *Joseph v. General Motors Corp.*, 109 F.R.D. 635, 642

21  (D. Colo. 1986)(certifying class action on behalf of Colorado residents who were

22  current or former owners or lessees of particular model year automobile equipped

23  with particular engine in case against automobile manufacturer alleging

24  negligence, strict products liability and breach of warranty), persuasively

25  explained why a class action is superior to individual litigation or alternative

26  proceedings:

27          I am convinced, however, that a class action would be far superior to
            any other method of adjudicating this controversy, including

28

1      arbitration.  First, relitigation of the same issues and presentation of
2  the same evidence in hundreds of individual actions or arbitration
  proceedings would be grossly inefficient and wasteful of judicial
3  resources.  Second, maintenance of individual actions would be
  prohibitively expensive.  Many of the crucial issues in the case will
4  require substantial discovery, expert testimony, and trial time, all of
  which would render uneconomical individual actions.  *See In Re*
5  *Cadillac V8-6-4 Class Action*, 93 N.J. 412, 461 A.2d 736, 748 (N.J.
  1983).

6  The same analysis applies with equal weight in this case.

7      131.   Highlighting the superiority of the class action mechanism with

8  respect to these claims is the efforts which Plaintiff's counsel have undertaken to

9  date.  In prosecuting its claims (to which Land Rover has denied any liability

10  whatsoever), Plaintiff has reviewed more than 220,000 documents, has deposed

11  numerous Land Rover representatives (in New York and in Washington D.C.), has

12  retained an expert witness and has deposed Land Rover's expert witness.  (Shah

13  Decl. at ¶¶ 1, 3.)  Moreover, in order to effectively prosecute this action, Plaintiff's

14  counsel have also deposed representatives from Land Rover United Kingdom

15  ("LRUK").  It is simply impracticable to expect that individual plaintiffs would

16  undertake this type of effort to prosecute a claim worth several thousand dollars.

17  Common sense dictates that this is true even where fee shifting statutes may exist,

18  which would not provide an economic incentive for attorneys to handle claims

19  worth several thousand dollars because it simply would not be economically

20  viable to risk the substantial time, effort and cost, including expert expenses,

21  necessary to prosecute and prove these claims.  *See, e.g., Lee v. ABC Carpet &*

22  *Home*, 236 F.R.D. 193, 203 (S.D.N.Y. 2006)(certifying class action where

23  defendant argued that "Labor Law's fee-shifting provisions obviate[d] Plaintiff's

24  argument against individual actions").

25      132.   Similarly, the existence of state lemon laws do not detract from the

26  superiority of the class action mechanism.  In *Hanlon, supra*, in which the Court

27  of Appeal approved the settlement of a class action involving the defective latches

28

CASE NO. 8:07-cv-0627-AG-RNB    **PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**    Page -51-

1  on rear lift gates of Chrysler minivans, the court addressed the superiority element

2  and stated:

> Rule 23(b)(3) also requires that class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case. Wright, Miller & Kane, [Federal Practice & Procedure] § 1779 [2d ed. 1986]. This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution. In this instance, the alternative methods of resolution are individual claims for a small amount of consequential damages or latch replacement. Further, the statute of limitations has run for owners of older vehicles under many state laws, and state lemon laws almost universally require that the vehicle be defective beyond repair-a condition which is impossible for many owners to demonstrate. Thus, many claims could not be successfully asserted individually. Even if efficacious, these claims would not only unnecessarily engage the judiciary, but would prove uneconomic for potential plaintiffs. In most cases, litigation costs would dwarf potential recovery. In this sense, the proposed class action is paradigmatic. A fair examination of alternatives can only result in the apodictic conclusion that a class action is the clearly preferred procedure in this case.

14  *Id.* at 1023.

15       133. Lemon laws are generally set up to permit "buy backs" of Vehicles, a

16  remedy which does not appropriately or adequately address the tire replacement

17  issue in this case. Under the Florida lemon law, in order to qualify under the

18  statute, the defect in the vehicle must have been the subject of repair three or more

19  times. After the third repair attempt, the owner must give the manufacturer notice

20  of the defect and an opportunity to cure the defect. F.S.A. § 681.104. If the

21  problem is not resolved, the owner must then submit his claim to the

22  manufacturer's arbitration program (the BBB Auto Line program). F.S.A. §

23  681.108. If the owner remains unsatisfied with the arbitration results, he/she may

24  then file a lawsuit to seek lemon law remedies. F.S.A. § 681.112. As such, lemon

25  law remedies and procedures do not contemplate the types of issues and remedies

26  that arise in the context of this action. Furthermore, as discussed above, since

27  Land Rover has not publicly acknowledged the nature of the alleged defect at

28

issue in this litigation to its customers, there would be no reason to expect that customers would demand that Land Rover repair the alignment geometry of the Vehicles -- much less three times.

134.   The second factor, "the extent and nature of any litigation concerning the controversy already commenced" by members of the Class, also supports proceeding with this action.  To the Court's  knowledge, there are no other actions currently pending involving Florida owners and lessees.

135.   The third factor is the desirability "of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C).  This forum is undoubtedly an appropriate forum for the resolution of Plaintiff's claims because Land Rover was headquartered within this District at the time that this action was commenced.

136.   The fourth and final factor is "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D).  As discussed below, this action is exceedingly manageable and the claims for which Plaintiff seeks class certification are all based on the same set of operative facts.

## F.   <u>Treatment Of This Case As A Class Action Is Manageable</u>

137.   To date, the parties have encountered no difficulties in managing this case as a class action and this case easily can be tried and adjudicated as a class action.  As the California Court of Appeals noted in *Earley v. Superior Court,* 79 Cal. App. 4th 1420, 1434 (2nd Dist. 2000), a class action can be tried as to liability and damages with Plaintiff acting as the fiduciary on behalf of the Class:

> A class action is a representative action in which the class representatives assume a fiduciary responsibility to prosecute the action on behalf of the absent parties. The representative parties not only make the decision to bring the case in the first place, but even after class certification and notice, they are the ones responsible for trying the case, appearing in court and working with class counsel on behalf of absent members. The structure of the class action does not allow absent class members to become active parties, since 'to the extent the absent class members are compelled to participate in the trial of the lawsuit, the effectiveness of the class action device is

destroyed.'  The very purpose of the class action is to relieve the absent members of the burden of participating in the action.

(Citations and parentheticals omitted.)  Plaintiff proposes that the trial of this action be bifurcated into (1) a liability phase (including a determination of injunctive relief) and (2) a damages phase.  Bifurcation of class actions into a liability phase and a damages phase is widely recognized and accepted.  *See Bates v. United Parcel Service*, 204 F.R.D. 440, 448 (N.D.Ca. 2001).

138.   The liability phase will consist of a jury trial.  The central issues to be determined in the liability phase are: (a) whether the Vehicles are defective; (b) whether Land Rover was aware of the defect in the Vehicles; (c) whether Land Rover had a duty to disclose its knowledge regarding the defective nature of the Vehicles; and (d) whether Land Rover's conduct violated the statutes and common law upon which Plaintiff's claims are based.  Plaintiff will attempt to prove Land Rover's liability through a number of methods, including, *inter alia*, the presentation of Land Rover's own documents and records, deposition and witness testimony (including Land Rover's representatives and the Plaintiff) and expert testimony.  Accordingly, the Court  does not anticipate that the liability phase of the trial would be markedly more complex than any non-class consumer product case and reasonably believes that the liability phase can be tried in approximately eight (8) to ten (10) days.

139.   The second phase of the trial will focus on Class damages.  The central issue to be determined in the damages phase is the amount of damages and relief which to which Class members are entitled.  Plaintiff will provide the jury with a basis to calculate Class-wide damages though the presentation of data and statistics (through experts), as well as, *inter alia*, evidence regarding the effect of the defect at issue, repair and replacement costs and product purchase price.  *See* 3 Newberg on Class Actions § 10.5 at 483-487 (4th ed. 2002)(there is a growing

1   trend in favor of using aggregate damages trials).  It is well settled that the

2   calculation of damages on a Class-wide basis is both proper and does not create

3   manageability problems.  *See, e.g., In Re Sugar Industry Antitrust Litigation,*

4   *supra*; *Bell v. Farmers Insurance Exchange*, 9 Ca.Rptr.3d 544, (1st Dist.

5   2004)("We find little basis in the decisional law for skepticism regarding the

6   appropriateness of the scientific methodology of inferential statistics as a

7   technique for determining damages in an appropriate case").

8          140.   This method has been approved by the leading treatise on class

9   actions:

10         Inherent in the basic theory of class actions is the fact that the court
           and the parties recognize the defendant's full liability exposure from
11         the outset, because of common questions of the defendant's liability
           to the class.  If the liability to the class is proved, then class recovery
12         entitlement is measured by individual or aggregate proofs of loss or
           of the defendant's unjust enrichment.
13

14   3 Newberg on Class Actions, § 10.05*; see also, In re: Chevron U.S.A., Inc.*, 109

15   F.3d. 1016, 1019-20 (5th Cir. 1997)("The essence of the science of inferential

16   statistics that one may confidently draw inferences about the whole from a

17   representative sample of the whole"); *In re Simon II Litigation*, 211 F.R.D. 86, 150

18   (E.D.N.Y. 2002), *vacated and remanded on other grounds*, 407 F.3d 125 (2d Cir.

19   2005)("The use of statistical evidence and methods in the American judicial

20   system to establish liability and damages is appropriate" in mass injury cases);

21   *Segar v. Smith*, 738 F.2d 1249, 1264 (D.C.Cir. 1984)(court calculated back and

22   front pay in Title VII case on a class-wide basis using statistical methods).

23         141.   Plaintiff's anticipated presentation of damages (based on a statistical,

24   formulaic, analysis of the various factors set forth above), is particularly

25   manageable in the context of the common remedies being sought (*i.e*, refunds,

26   repairs, etc.).  The straightforward damages, and evidence regarding the same,

27   which will be presented by Plaintiff during the damages phase of the trial, are

28   markedly less complicated than many other class actions which have been deemed

1   manageable. *See Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir.

2   1996)(upholding aggregate damage award predicated on claims arising from the

3   detention and torture of thousands of citizens, including award of compensatory

4   and exemplary damages); *Dellums v. Powell*, 566 F.2d 167, 189 (D.C.Cir.

5   1977)(upholding a jury's award of a lump sum of compensatory damages, and a

6   distribution matrix of damages for unlawful arrests and illegal detentions based on

7   the arrests).  Thus, the Court  does not anticipate that the damages phase of the

8   trial would be particularly complex and reasonably believes that the damage phase

9   can be tried in approximately two (2) to three (3) days.

10          142.   Once aggregate damages are established, it is well established that

11   "the allocation of the aggregate sum [of the judgment] among class members is an

12   internal class accounting question that does not directly concern the defendant...."

13   *Bell*, 9 Cal.Rptr.3d at 581; 2 Conte & Newberg on Class Actions, § 4:26.  Any

14   damages award by the trier of fact would be claimed by Class members through a

15   Court approved process overseen either by a third party claims administrator or a

16   special master. *See Newberg on Class Actions* § 9.55.

17          **G.    Certification Of The Proposed Class Is Consistent With
18          Principles Of Constitutional Due Process**

19          143.   Any argument by Defendant that certification of a class action in this

20   case would violate its right to due process under the Fourteenth Amendment to the

21   United States Constitution or otherwise by preventing it from asserting individual

22   defenses is unpersuasive.  It is established that certification of a class action in

23   similar circumstances does not implicate the due process rights of a defendant.

24   *See Joseph v. General Motors Corp.*, 109 F.R.D. 635, 642 (D. Colo.

25   1986)(rejecting defendant's "contention that certification of a class action in this

26   case would violate its right to due process of law under the Fourteenth

27   Amendment by preventing it from asserting individual defenses"); *see also Dukes*

28

1  *v. Wal-mart, Inc.*, 509 F.3d 1168, 1190-1193 (9th Cir. 2007)(affirming certification

2  of nationwide class action of approximately 1.5 million women and explaining

3  how a trial plan in a complex class action can be fashioned to protect "the due

4  process rights of all involved parties"); *Crane v. International Paper Co.*, 2005

5  WL 3627139 (D.S.C. April 19, 2005)(rejecting argument that "court must

6  decertify the class because defendants' due process rights cannot be adequately

7  protected without the case becoming unmanageable" and concluding that "the case

8  is manageable without impairing defendants' due process rights including their

9  right to a jury determination of disputed issues of fact, if necessary on a class

10  member-by-class member basis for some class members"); *In re Cardizem CD*

11  *Antitrust Litig.*, 200 F.R.D. 326, 350 (E.D.Mich. 2001)(rejecting argument that an

12  assessment of class members' aggregate damages would violate their due process

13  rights); *Long v. Trans World Airlines, Inc.*, 761 F.Supp. 1320, 1327 (N.D.Ill.

14  1991)("Challenges that such aggregate proof affects substantive law and otherwise

15  violates the defendant's due process or jury trial rights to contest each member's

16  claim individually, will not withstand analysis" [and] "[v]irtually all circuits that

17  have considered this issue ... have expressly condoned aggregate proofs of

18  damages"); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 641 F.Supp. 259,

19  263 (D.Ariz. 1986)(*citing* 2 H. Newberg, *Newberg on Class Actions* § 10.12 at 368

20  (2d ed. 1985)(defendant's due process rights are not jeopardized when it has "been

21  given the opportunity to challenge damages on a class basis at the trial").

22  **VI.   CONCLUSION**

23       144.   Class actions are an important tool in protecting consumers' rights in

24  this country. *See, e.g., State of California v. Levi Strauss & Co.*, 41 Cal.3d 460,

25  471 (1986)("the consumer class action is an essential tool for the protection of

26  consumers against exploitative business practices"). Where, as here, after a

27  vigorous analysis, the Court concludes that Plaintiff has satisfied all applicable

28

1  requirements of Rule 23 of the Federal Rules of Civil Procedure, it will not

2  hesitate to certify an appropriate class.  Here, Plaintiff has identified exactly such a

3  Class.

4      145.   For the reasons stated above, the Court concludes that Plaintiff's

5  Motion for Class Certification should be and hereby is Granted.

6      146.   The Court appoints Plaintiff as the Class representative for this Class

7  and his attorneys as Class Counsel.

8      147.   The parties shall meet and confer and, to the extent possible, present a

9  joint and agreed upon notice plan and form(s) of Class notice to the Court within

10  thirty (30) days of the date of this decision.  If the parties are unable to so agree,

11  they shall each submit a competing notice plan and form(s) of Class notice within

12  thirty (30) days of the date of this decision.

13                                        LAW OFFICES OF THOMAS D.
                                          MAURIELLO
14

15  Dated:  July 22, 2008          By: s/Thomas D. Mauriello

16                                        Thomas D. Mauriello (SBN 144811)
                                          209 Avenida Fabricante, Suite 125
17                                        San Clemente, CA 92672
                                          Telephone: (949) 542-3555
18                                        Facsimile: (949) 606-9690
                                          tomm@maurlaw.com
19
                                          Mark F. Anderson (SBN 44787)
20                                        Matthew Da Vega (SBN 195443)
                                          KEMNITZER, ANDERSON,
21                                        BARRON,  OGILVIE, & BREWER
                                          LLP
22                                        445 Bush Street, 6th Floor
                                          San Francisco, CA  94108
23                                        Telephone:  (415) 861-2265
                                          Facsimile: (415) 861-3151
24                                        mark@kabolaw.com
                                          mdavega@kabolaw.com
25
                                          James E. Miller
26                                        Karen M. Leser-Grenon
                                          (SBN 231189)
27                                        SHEPHERD FINKELMAN MILLER
                                          & SHAH, LLP
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
jmiller@sfmslaw.com
kleser@sfmslaw.com

James C. Shah
Nathan C. Zipperian
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
jshah@sfmslaw.com
nzipperian@sfmslaw.com

**Attorneys for Plaintiff
and the Proposed Class**